1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| KEITH TROUT, *guardian ad litem of minors* D.A., J.G.1, J.G.2, and J.G.3, | Case No.  1:22-cv-00867-ADA-SAB |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS RE: MOTIONS TO DISMISS** |
| v. | (ECF Nos. 29, 34, 37, 39, 40, 41, 42, 45, 46) |
| COUNTY OF MADERA, et al., | **OBJECTIONS DUE WITHIN FOURTEEN DAYS** |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20

## I.

### INTRODUCTION

21

22    Keith Trout ("Petitioner"), guardian ad litem for minor Plaintiffs D.A., J.G.1, J.G.2, and

23  J.G.3 (collectively, the "Minors") initiated this civil rights action on behalf of the Estate of Calley

24  Jean Garay and the minors (collectively, "Plaintiffs") on July 14, 2022.  (ECF No. 1.)  Presently

25  before this Court are motions to dismiss filed by Defendants Camarena Health and Camarena

26  Health Foundation (collectively, "Camarena") (ECF No. 29), Community Action Partnership of

27  Madera County, Inc. ("CAPMC") (ECF No. 34), and the County of Madera ("County") (ECF No.

28  42).  The District Judge referred the motions to dismiss to this Court for the preparation of

findings and recommendations and/or other appropriate action.  (ECF Nos. 30, 35, 43.)

A hearing on the motion was held on May 10, 2023.  (See ECF No. 47.)  Counsel Timothy Scott appeared by videoconference for Plaintiffs.  Counsel Amanda Benedict appeared by videoconference for Defendant CAPMC.[1]  Counsel Zachary Rutman appeared by videoconference for both Camarena Defendants.  Counsel Timothy John Buchanan appeared in person for Defendant County.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, the arguments presented at the May 10, 2023 hearing, as well as the Court's file, the Court issues the following findings and recommendations recommending each of the motions to dismiss be granted in part, with leave to amend.

## II.

## BACKGROUND

### A.    Plaintiffs' Allegations

The Minor Plaintiffs are children of the late Calley Jean Garay ("Calley").  (FAC ¶¶ 2, 21, ECF No. 27.)  The Estate of Calley Jean Garay brings this action through Calley's father and successor in interest, Keith Trout, who also serves as guardian ad litem for the Minor Plaintiffs.[2]  (Id. at ¶¶ 22, 23.)  Plaintiffs assert Defendant CAPMC is a private 501(c)(3) corporation organized under the laws of the State of California, but has liability as a state actor under 42 U.S.C. § 1983 pursuant to Ninth Circuit and Supreme Court caselaw.  (Id. at ¶¶ 25–26.)  The Camarena Defendants are corporations organized under the laws of the State of California.  (Id. at ¶¶ 36–37.)

Plaintiffs allege Calley and Mr. Garay married in 2015.  (Id. at ¶ 41.)  They had three children, J.G.1, J.G.2, and J.G.3; Calley also had a child from a previous relationship, D.A.  (Id. at ¶¶ 42, 43.)

In 2015, Calley reported domestic abuse to the Chowchilla Police Department and secured a restraining order against Mr. Garay.  (Id. at ¶¶ 44–46.)  The 2015 domestic violence case

---

[1] It appears Ms. Benedict specially appeared for CAPMC on behalf of counsel Cynthia Gill Lawrence, though to date, Ms. Benedict has not filed a notice of appearance or association of counsel with the Court.

[2] The Court granted Keith Trout's application to be appointed guardian ad litem for the Minors on August 30, 2022.  (ECF No. 15.)

reported that Mr. Garay's abuse included punching Calley with closed fists, pulling her hair, choking her with hands around her throat, taping a telephone to her head, striking her with a fire poker, pouring drinks on her, holding a handgun to her head, and making repeated threats against her life.  (Id. at ¶ 44.)  Calley reported domestic violence against Mr. Garay again to the police in May 2020.  (Id. at ¶ 54.)

Plaintiffs allege the County and CAPMC had actual notice of the domestic violence, including the 2015 and 2020 incidents, and they were aware Calley had a restraining order against Mr. Garay.  (Id. at ¶¶ 47–48, 52–53, 57–60, 65–66.)  Plaintiffs allege that, as providers of victim-witness services and domestic-violence victim services, the County and CAPMC knew that Mr. Garay was likely to stalk and kill his family members if they sought to leave the abusive home. (Id. at ¶¶ 7, 48–51, 93.)  County and CAPMC were also aware that Mr. Garay possessed numerous firearms, had once brought a gun to the children's school, and had abused Calley and the children on many other occasions—having assisted Calley in drafting and procuring the 2020 restraining order.  (Id. at ¶¶ 67–69.)

CAPMC assisted Calley in leaving her husband and taking the children with her.  (Id. at ¶ 62.)  The County told Calley it would help protect Calley and the children from her husband.  (Id. at 8.)  Tina Rodriguez, a supervisor for CAPMC that oversaw its victim-witness and domestic violence programs, accompanied Calley to a court proceeding against Mr. Garay, personally witnessed Mr. Garay acting angry and threatening Calley at the July 2020 court proceeding, and requested security to accompany herself and Calley out of the courtroom that day.  (Id. at ¶¶ 70, 75.)  Plaintiffs allege Ms. Rodriguez did not, however, arrange for specific security steps to be taken to protect Calley and her children thereafter.  (Id. at ¶ 76.)

Plaintiffs allege the Camarena Defendants provide healthcare and other services to victims of domestic abuse, and were aware of the risks posed by abusive spouses, and Mr. Garay in particular.  (Id. at ¶¶ 77–80, 82.)  Plaintiffs assert that federal and state law, and prevailing minimum standards of care in the delivery of healthcare services, require that private medical information, including the dates, times, and locations of specific healthcare treatment appointments, be kept private and be disclosed only to the patient or as otherwise provided by

law.  (Id. at ¶¶ 81, 83.)  Plaintiffs allege the Camarena Defendants had actual and constructive knowledge that Calley was a victim of domestic violence, was in danger from Mr. Garay, and would be in even greater danger if her whereabouts were disclosed to Mr. Garay.  (Id. at ¶¶ 82–83.)

However, on or about July 14, 2020, a Camarena Health employee called a cell phone number belonging to Mr. Garay—and not Calley—to confirm a medical appointment at its clinic for Calley.  (Id. at ¶ 84.)  Plaintiffs allege the Camarena Health employee spoke with Mr. Garay, knowing he was not the patient with the appointment, and informed Mr. Garay of the date, time, and location of Calley's appointment.  (Id. at ¶¶ 85–86.)  Plaintiffs further allege this employee knew or should have known that Mr. Garay posed a specific and grave threat to Calley and her children.  (Id. at ¶ 87.)  Nevertheless, Camarena Health had a policy, practice, and custom of leaving messages and communicating healthcare appointment information to persons other than the patient, as it did with Calley.  (Id. at ¶¶ 88–89.)

Plaintiffs allege the County and CAPMC knew that Calley was receiving healthcare from Camarena Health while she was living at a CAPMC facility.  (Id. at ¶¶ 90–91.)  County and CAPMC helped Calley obtain this healthcare, and helped transport her and the children to the clinic.  (Id. at ¶¶ 92, 105.)  Plaintiffs further allege the County and CAPMC had actual and constructive knowledge, and knew and should have known that Camarena Health had disclosed private healthcare information to nonpatients, and to Mr. Garay in particular.  (Id. at ¶¶ 103–04.)  Plaintiffs allege the County and CAPMC had insufficient and ineffectual training, supervision, policies and/or procedures in place to guard against disclosure of the whereabouts of abuse victims, including information regarding their healthcare appointments.  (Id. at ¶¶ 96, 103.)

The County and CAPMC assisted in transporting Calley to her medical appointment at Camarena Health on July 14, 2020.  (Id. at ¶¶ 105–06.)  Despite their knowledge of the danger Mr. Garay posed to Calley at the medical appointment, County and CAPMC transported them in an easily-identifiable vehicle, staffed with only one unarmed female employee, who had been employed approximately six months as of the time of the appointment.  (Id. at ¶¶ 107–08.)  Plaintiffs claim County and CAPMC took insufficient steps to keep Calley and her children safe

1   at the medical appointment.

2       Mr. Garay, having been informed of the date, time and location of Calley's appointment,

3   waited for Calley to finish her appointment and leave the clinic.  (Id. at ¶ 109.)  Mr. Garay shot

4   Calley seven time at close range with a .380 semi-automatic handgun outside her vehicle, as

5   Calley tried to shield the children.  (Id. at ¶ 114.)  Calley did not die immediately, but suffered

6   extreme pain and distress before, during and after the shooting before she died.  (Id. at ¶ 115.)

7   Calley's children, who witnessed the shooting, suffered grave emotional injury and trauma, and

8   physical injury by virtue of their immediate presence at the scene.  (Id. at ¶¶ 114, 116.)

9       Ms. Rodriguez was fired for "incompetency" and "dishonesty" after Calley's death.  (Id.

10  at ¶ 98.)  Plaintiffs allege Ms. Rodriguez's acts of incompetency and dishonesty that led to

11  Calley's death were repeated and ongoing, and predated Calley's case, thus putting the County

12  and CAPMC on actual and constructive notice that Ms. Rodriguez was putting abuse victims in

13  danger and was unfit to serve as a victim's services supervisor.  (Id. at ¶¶ 99–101.)  Plaintiffs

14  further allege the County and CAPMC failed to adequately train and supervise Ms. Rodriguez and

15  wrongly hired and retained her, despite knowing of her unfitness for employment and the risk she

16  posed to abuse victims.  (Id. at ¶ 102.)

17      Plaintiffs allege they filed a timely tort claim pursuant to the California Tort Claims Act

18  (Cal. Gov. Code §§ 810–996.6) against County, which was denied.  (Id. at ¶ 16.)

19      **B.      Procedural Background**

20      Plaintiffs initiated this action on July 14, 2022, against Defendants County, CAPMC,

21  Martha Shelter, Camarena, Lorena Elenez, Deborah Martinez, Michelle Baas, Kim Johnson,

22  Danny Morris, Sara Bosse, Mattie Mendez, Bronco Professional Park, LLC, Bronco Professional

23  Park Owners Association, Rose Alvarado, Julio L. Garay, Sr., Julio J. Garay, Jr., and Amanda

24  Garay (collectively, "Defendants").[3]  (ECF No. 1.)

25

---

26  [3] The Court notes Plaintiffs initially filed their civil action in the Northern District Court of California in August
    2021.  Trout v. County of Madera, et al., No. 4:21-cv-06061-PJH (N.D. Cal. Aug. 5, 2021).  The Northern District
27  court dismissed the action for improper venue, without prejudice to refiling in this district.  Id. at ECF No. 143 (N.D.
    Cal. Jul. 6, 2022).  The court expressly declined to reach any findings on the merits as to the sufficiency of the
28  allegations or viability of Plaintiffs' claims on the merits, but did note several of the motions to dismiss "appear
    meritorious."  See id., ECF No. 143 at 15.

1    The operative first amended complaint ("FAC") asserts <u>Monell</u> claims pursuant to 42

2    U.S.C. § 1983 against Defendants County and CAPMC, for violations of the Fourteenth

3    Amendment, state-created danger and interference with parent/child relationship; and state law

4    claims for negligence, negligent infliction of emotional distress, and negligent training and

5    supervision against all Defendants.  (ECF No. 27.)  Plaintiffs seek monetary damages, civil

6    penalties, wrongful death damages, and attorneys' fees and costs.  (FAC at 20–21.)

7    The Camarena Defendants moved to dismiss the FAC on February 21, 2023.  (ECF No.

8    29.)  Plaintiffs opposed the motion on March 7, 2023 (ECF No. 37), and Camarena replied on

9    March 17, 2023 (ECF No. 39.)

10    CAPMC moved to dismiss the FAC on March 3, 2023.  (ECF No. 34.)  Plaintiffs opposed

11    this motion on March 17, 2023 (ECF No. 40), and CAPMC replied on March 27, 2023 (ECF No.

12    41).

13    The County moved to dismiss the FAC on March 27, 2023.  (ECF No. 42.)  Plaintiffs

14    opposed this motion on April 10, 2023 (ECF No. 45), and County replied on April 20, 2023 (ECF

15    No. 46.)

16    On May 10, 2023, the parties appeared before the Court for a hearing on all three motions

17    to dismiss, as previously detailed.  (ECF No. 47.)  The matter is now deemed submitted.

### III.

### LEGAL STANDARD

20    A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure

21    12(b)(6) tests the legal sufficiency of a complaint.  <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir.

22    2001).  Rule 8(a) requires that a pleading contain "a short and plain statement of the claim

23    showing that the pleader is entitled to relief."  <u>See Ashcroft v. Iqbal (Iqbal)</u>, 556 U.S. 662, 678–79

24    (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice

25    of what the claim … is and the grounds upon which it rests."  <u>Bell Atlantic v. Twombly</u>

26    <u>(Twombly)</u>, 550 U.S. 544, 555 (2007) (internal quotations omitted).  "This simplified notice

27    pleading standard relies on liberal discovery rules and summary judgment motions to define

28    disputed facts and issues and to dispose of unmeritorious claims."  <u>Swierkiewicz v. Sorema N.A.</u>,

1  534 U.S. 506, 512 (2002).

2  On a motion to dismiss, the factual allegations of the complaint must be accepted as true.

3  Cruz v. Beto, 405 U.S. 319, 322 (1972). A court is bound to give the plaintiff the benefit of every

4  reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. Retail

5  Clerks Int'l Ass'n v. Schermerhorn (Retail Clerks), 373 U.S. 746, 753 n.6 (1963). A plaintiff

6  need not allege "'specific facts' beyond those necessary to state his claim and the grounds

7  showing entitlement to relief." Twombly, 550 U.S. at 570. "A claim has facial plausibility when

8  the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

9  defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S.

10  at 556).

11  Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

12  factual allegations." U.S. ex rel. Chunie v. Ringrose, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

13  While Rule 8(a) does not require detailed factual allegations, "it demands more than an

14  unadorned, the defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. A

15  pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

16  elements of a cause of action." Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 678

17  ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

18  statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove

19  facts that it has not alleged or that the defendants have violated the … laws in ways that have not

20  been alleged." Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S.

21  519, 526 (1983).

22  Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough

23  facts to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 697 (quoting

24  Twombly, 550 U.S. at 570). Only where a plaintiff has failed to "nudge[] [his or her] claims …

25  across the line from conceivable to plausible," is the complaint properly dismissed. Id. at 680.

26  While the plausibility requirement is not akin to a probability requirement, it demands more than

27  "a sheer possibility that a defendant has acted unlawfully." Id. at 678. This plausibility inquiry is

28  "a context-specific task that requires the reviewing court to draw on its judicial experience and

1   common sense." Id. at 679.

2          If a complaint fails to state a plausible claim, "[a] district court should grant leave to

3   amend even if no request to amend the pleading was made, unless it determines that the pleading

4   could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122,

5   1130 (9th Cir. 2000) (en banc) (quoting Doe v. United States, 58 F.3d 484, 497 (9th Cir. 1995));

6   see also Gardner v. Martino, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in

7   denying leave to amend when amendment would be futile).  Although a district court should

8   freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to

9   deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint."

10  Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 520 (9th Cir. 2013) (quoting

11  Miller v. Yokohama Tire Corp., 358 F.3d 616, 622 (9th Cir. 2004)).

12                                          **IV.**

13             **CAMARENA DEFENDANTS' MOTION TO DISMISS (ECF NO. 29)**

14         Plaintiffs assert state law causes of action for negligence (claim 3), negligent infliction of

15  emotional distress (claim 4), and negligent training and supervision (claim 5) against the

16  Camarena Defendants.  (FAC at 3, 19–20.)  As noted, Plaintiffs seek monetary damages (general,

17  compensatory, punitive, and exemplary), civil penalties, wrongful death damages, and attorneys'

18  fees and costs from all Defendants, including the Camarena Defendants.  (Id. at 20–21.)

19         The Camarena Defendants move to dismiss all claims asserted against them pursuant to

20  Rule 12(b)(6).  (ECF No. 29.)

21         **A.      Request for Judicial Notice**

22         1.      Defendants' Request

23         The Camarena Defendants request the Court take judicial notice of the following

24  information: (1) a printout from the California Secretary of State's website showing that

25  Camarena Health Foundation was created on October 2, 2020 (Ex. A, ECF No. 29-3 at 3–4); and

26  (2) the publicly available Articles of Incorporation of Camarena Health Foundation, which were

27  filed with the California Secretary of State on October 2, 2020 (Ex. B, ECF No. 29-3 at 5–8).

28  (ECF No. 29-3 at 2.)

Courts may take judicial notice of "a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may take judicial notice of information displayed on government websites where neither party disputes the accuracy of the information contained therein. See Daniels-Hall v. Nat'l. Educ. Ass'n, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information on websites of two school districts because they were government entities). Specifically, Courts routinely take judicial notice of information contained in the California Secretary of State's website. See, e.g., Gerritsen v. Warner Bros. Ent. Inc., 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) (profiles on California Secretary of State website proper for judicial notice); see also Applied Underwriters, Inc. v. Lara, 530 F. Supp. 3d 914, 924 (E.D. Cal. 2021), aff'd on other grounds, 37 F.4th 579 (9th Cir. 2022), cert. denied, 143 S. Ct. 748 (2023) (judicially noticing business information from Nebraska Secretary of State website). Plaintiffs do not dispute the website or directly oppose the request for judicial notice. (See ECF No. 37 at 2–3.) Defendants' request is therefore granted.

2.     Plaintiffs' Request

In opposition to the Camarena Defendants' motion to dismiss, Plaintiffs reference staff lists for Camarena Health and Camarena Health Foundation, as shown on the Camarena websites, https://www.camarenahealth.org/about-us/staff/ and https://www.camarenahealth.org/foundation/. (ECF No. 37 at 3 (citing Fed. R. Evid. 201(b)(2), (c)(2)).) Defendants do not challenge the request for judicial notice in their reply briefing. (See, generally, ECF No. 39.) The Court grants Plaintiff's implied request for judicial notice as to the fact that the websites list the same individuals as chief officers for Camarena Health and chief board members for Camarena Health Foundation, but not for the truth of any other matter asserted. Fed. R. Evid. 201(b); see also Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001) (court may take judicial notice of undisputed matters of public record); cf. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1000 (9th Cir. 2018) (it is improper to judicially notice a transcript when the substance of the transcript "is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes.") (citation omitted).

**B.  Motion to Dismiss**

In their motion to dismiss, the Camarena Defendants argue all claims asserted against Camarena Health Foundation should be dismissed, because the Camarena Health Foundation did not exist at the time of the incident, and they seek dismissal of Plaintiff's claims for punitive damages, attorneys' fees, and civil penalties as asserted against them.  (ECF No. 29 at 4–9.)

1.  Claims Against Defendant Camarena Health Foundation

As previously noted, Calley was shot and killed by Mr. Garay on July 14, 2020, after a Camarena Health employee wrongfully disclosed the date, time, and location of Calley's upcoming medical appointment to Mr. Garay.[4]

The Camarena Defendants argue all claims as asserted against Camarena Health Foundation should be dismissed because Camarena Health Foundation did not exist until October 2, 2020.  (ECF No. 29 at 5.)  In support of their argument, the Camarena Defendants submit a copy of the Articles of Incorporation for Camarena Health Foundation from the California Secretary of State's webpage, which this Court has judicially noticed, and which indicates that Camarena Health Foundation was first registered as a corporation with the Secretary of State on October 2, 2020, *i.e.*, after the July 14, 2020 shooting.  (See Ex. A, ECF No. 29-3 at 4; Ex. B, ECF No. 29-3 at 6–8 (revealing incorporation document signed on September 25, 2020).)

In opposition, Plaintiffs argue dismissal of Camarena Health Foundation is premature, based on information and belief that Camarena Health Foundation may be liable under the theory of successor-liability.  (ECF No. 37 at 3.)  To that point, Plaintiffs seek judicial notice of the facts that the board members are the same for both Camarena Health and Camarena Health Foundation. Furthermore, Plaintiffs note the Articles of Incorporation indicate the "specific purpose" for which Camarena Health Foundation was formed includes "supporting" "Camarena Health … and any and all related activities."  (Id. (citing ECF No. 29-3 at 6).)  Plaintiffs argue that absent

---

[4] The Camarena Defendants allege additional facts in their motion to dismiss, such as alleging that Calley was the one who provided Mr. Garay's cell phone number to Camarena Health, and details of the communications between the Camarena Health employee and Mr. Garay which are not alleged in the FAC.  Such facts are not properly considered at the motion to dismiss stage and will not be addressed herein.  See, e.g., Schneider v. Cal. Dep't of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("new" allegations not contained in the complaint are irrelevant for Rule 12(b)(6) purposes and should not be considered).

10

discovery, they cannot determine whether Camarena Health Foundation has agreed to assume any of Camarena Health's liability, whether any of the two businesses have functionally consolidated or merged, whether Camarena Health Foundation is a mere continuation of Camarena Health, or whether any assets have been transferred between entities; therefore, dismissal of the Foundation entity would be premature at this stage.  Alternatively, Plaintiffs request leave to amend be granted as to their claims against Camarena Health Foundation, pending additional discovery.

Under California's rule of successor liability, a corporation purchasing the principal assets of another corporation does not assume the predecessor's liabilities unless one of the following exceptions applies: (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two entities, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the old entity's debts.[5]  See Hargrove & Costanzo v. U.S., No. CVF-06-046LJODLB, 2007 WL 2409590, at *4 (E.D. Cal. Aug. 21, 2007) (collecting cases). "The premise underlying the theory is that a business should not be allowed to defraud its creditors by simply changing its form.  The theory embraces and adopts several independent elements of various causes of action including alter ego, fraudulent conveyance, consolidation or merger, piercing of the corporate veil, and continuation."  Id. (citing Economy Refining & Serv. Co. v. Royal Nat'l Bank, 20 Cal. App. 3d 434 (1971)).  California courts have developed several tests, including the "mere continuation test," the "form of the merger test," and the "significant and identifiable part" test.  Id. (citation omitted).  The "mere continuation" exception, for example, requires a showing of one or both of two factors: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; and (2) one or more persons were officers, directors, or stockholders of both corporations.  Ray, 19 Cal.3d at 29.

While the parties generally discussed the theory of successor liability at the hearing, these arguments were superficial in nature and lacked supporting legal authorities; notably, no party

---

[5] The California Supreme Court also identified a fifth exception, which applies to strict products liability cases.  See Ray v. Alad Corp., 19 Cal.3d 22, 28, 34 (1977) (applying successor liability to products liability context) (collecting cases).

substantively briefed the issue for the Court in their pleadings.  The Camarena Defendants argued no facts are alleged in the FAC to show successor liability exists; furthermore, they argue the theory is inapplicable in this instance, where Camarena Health Foundation was not in existence at the time of the incident, and neither Camarena Health nor Camarena Health Foundation are dissolved corporations.  However, the Camarena Defendants did not identify legal authority to support this position.  Meanwhile, the Court notes none of the arguments raised by Plaintiffs in opposition to the Camarena Defendants' motion to dismiss or the facts proffered for judicial notice are alleged in the operative complaint.  Indeed, Plaintiffs conceded at the hearing that they did not plead facts in the FAC to establish their theory of successor liability, and sought leave to amend.  Thus, the FAC fails to allege facts sufficient to state a claim under this theory.

Nevertheless, Plaintiffs appear to present a colorable argument for successor liability in their opposition to the motion to dismiss.  It seems significant that the same individuals listed as chief officers of Camarena Health are also the chief board members of Camarena Health Foundation.  Moreover, the articles of incorporation for the Foundation states one of the two purposes for which the Foundation was formed is "[t]o promote, provide, support and encourage the general health and welfare of underserved individuals and families in the San Joaquin Valley, *including supporting Camarena Health, … and any and all related activities*…"  (ECF No. 29-3 at 6 (emphasis added)), which supports Plaintiffs' argument that the entities are linked.  Plaintiffs should therefore be granted leave to amend the complaint to include facts that support their successor liability theory.

Furthermore, the Court notes that successor liability is an equitable doctrine, and "the question [of] whether it is fair to impose successor liability is exclusively for the trial court." Rosales v. ThermexThermatron, 67 Cal. App. 4th 187, 196 (1998); see also CenterPoint Energy, Inc. v. Superior Ct., 157 Cal. App. 4th 1101, 1122 (2007) (noting considerations of fairness and equity apply to successor liability cases, and California courts have taken risk spreading doctrines into account in such cases).  "[E]ach successor liability 'case must be determined on its own facts' including looking at the 'totality of the unusual circumstances.' " CenterPoint Energy, Inc., 157 Cal. App. 4th at 1122 (quoting Rego v. ARC Water Treatment Co. of Pa., 181 F.3d 396,

1   403 (3d Cir. 1999) (applying successor liability in employment context)).  Further, because

2   determinations of successor liability are highly fact-specific, courts have declined to dismiss such

3   claims at the pleadings stage.  See, e.g., Wilson v. Metals USA, Inc., No. CIV. S-12-0568

4   LKK/GGH, 2013 WL 4586919 (E.D. Cal. Aug. 28, 2013) ("As the court previously noted,

5   [d]eterminations of successor liability are highly fact-specific, and it would be inappropriate for

6   the court to rule on the substantive merits of plaintiffs' case for successor liability at the pleadings

7   stage." (internal quotations omitted)).

8          At bottom, the Court finds Plaintiffs did not plead facts sufficient to state a claim against

9   Camarena Health Foundation, and the FAC does not contain any facts to support a theory of

10  successor liability.  However, the Court cannot say at this juncture that amendment would be

11  futile.  Accordingly, the Court recommends the Camarena Defendants' motion to dismiss be

12  granted, but that Plaintiffs be granted leave to amend.

13              2.       Claim for Punitive Damages

14         The Camarena Defendants argue Plaintiffs' claim for punitive damages should be

15  dismissed, as asserted against them, because Plaintiffs only assert claims arising from negligence

16  against the Camarena Defendants (i.e., negligence, negligent infliction of emotional distress, and

17  negligent training and supervision).  (ECF No. 29 at 5–6.)  Moreover, Defendants argue Plaintiffs

18  have not alleged facts showing malice.  (Id. at 6–8.)  Further, even assuming Plaintiffs sufficiently

19  alleged the Camarena Health employee acted maliciously, the Camarena Defendants argue a

20  corporation may only become liable for punitive damages when the malicious act of the employee

21  was known to an officer, director, or managing agent of the corporation and such act was

22  authorized or ratified by them; Defendants argue these facts are not alleged in the FAC.  (Id. at 6.)

23         Plaintiffs challenge the Camarena Defendants' arguments regarding damages and fees on

24  procedural grounds, asserting the dismissal of punitive damages is not appropriate for

25  consideration on a Rule 12(b)(6) motion to dismiss (ECF No. 37 at 4–5); however, they do not

26  oppose Defendants' arguments with respect to the availability of punitive damages and fees in

27  any substantive manner.  At the hearing, Plaintiffs conceded their prayer for relief was stated

28  "globally" and that they haven't alleged facts supporting punitive damages specifically against

1  the Camarena Defendants at this time, but that striking the damages at the pleadings stage is not

2  appropriate.  The Court finds these arguments unpersuasive.

3        As an initial matter, the Court notes the Ninth Circuit has suggested that a motion to have

4  certain portions of a complaint dismissed—such as a claim for certain types of damages—is

5  better suited for a Rule 12(b)(6) motion than a Rule 12(f) motion to strike.  See Whittlestone, Inc.

6  v. Handi-Craft Co., 618 F.3d 970, 974 (9th Cir. 2010) (citation omitted) (holding Rule 12(f) does

7  not authorize district courts to strike claims for damages on the ground that such claims are

8  precluded as a matter of law, and that a Rule 12(b)(6) motion or motion for summary judgment

9  already serves the purpose of dismissing some or all of a pleading); see also Oushana v. Lowe's

10  Cos., Inc., No. 1:16-cv-01782-AWI-SAB, 2017 WL 5070271, at *2 (E.D. Cal. Nov. 3, 2017)

11  ("Rule 12(f) may not be used to strike a request for punitive damages.  The proper vehicle for

12  challenging the sufficiency of a punitive damages claim is a motion to dismiss under Rule

13  12(b)(6)."); Palmer v. Vasquez, No. 1:13-cv-01400-AWI-JLT, 2014 WL 897362, at *12 (E.D.

14  Cal. Mar. 6, 2014) (recommending alleged damages related to emotional pain, hardship, and

15  suffering be dismissed under Rule 12(b)(6) without leave to amend because such damages are

16  unavailable in a survival action under California statutes); cf. Viramontes v. Pfizer Inc., No. 2:15-

17  CV-1754 TLN AC (PS), 2016 WL 4615521, at *5–6 (E.D. Cal. Sept. 6, 2016) (on Rule 12(b)(6)

18  motion, granting leave to amend loss of consortium claim and permitting amendment of prayer

19  for punitive damages where defendants failed to establish such damages were not available in

20  such claim as a matter of law, but denying leave to amend prayer to include lost wages where

21  such damages were not available under the claim as a matter of law).  In light of the foregoing

22  authorities, this Court concludes that dismissing unwarranted damages claims at the pleadings

23  stage is permissible and routinely contemplated by courts.  Accordingly, this Court addresses

24  Defendants' motion to dismiss Plaintiffs' claims for punitive damages as they relate to Plaintiffs'

25  negligence claims against the Camarena Defendants.

26        Under California law, a plaintiff is entitled to recover exemplary damages to punish a

27  defendant if a plaintiff proves by clear and convincing evidence that the defendant "has been

28  guilty of fraud, oppression, or malice…."  Cal. Civ. Code § 3294(a).  If liability against a

corporation is premised on the wrongdoing of individuals employed by that corporation, the corporate entity may not be held liable for the actions of its employees unless it "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(b).   Further, imposition of liability for exemplary damages on a corporate defendant requires that "the advance knowledge and conscious disregard, authorization, ratification, or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." Id.

A request for punitive damages is not a standalone cause of action, it is merely a type of remedy that is dependent upon a viable cause of action. Marroquin v. Pfizer, Inc., 367 F. Supp. 3d 1152, 1168 (E.D. Cal. 2019); Bear v. Ohio Dept. of Rehab. & Corr., 156 F. Supp. 3d 898, 907 (N.D. Ohio 2016); Carino v. Standard Pac. Corp., 2014 WL 1400853 (E.D. Cal. Apr. 9, 2014); see also Caira v. Offner, 126 Cal. App. 4th 12, 39 n. 20 (2005) ("[T]here is no separate cause of action for punitive damages-they are only ancillary to a valid cause of action.").   Therefore, the Court must consider whether Plaintiffs have alleged sufficient facts to support a claim for punitive damages with respect to each cause of action.

Here, Plaintiffs' claims against the Camarena Defendants all arise from negligence, specifically, negligence (claim 3), negligent infliction of emotional distress (claim 4), and negligent training and supervision (claim 5). (FAC at 3, 19–20.) As the Ninth Circuit has noted, a claim based on elements such as "conscious disregard"—to which punitive damages may attach—"is a standard clearly at odds with negligence." Hines v. Nat'l Continental Ins. Co., 789 Fed. App'x 45, 46 (9th Cir. 2019).   Plaintiffs' request for punitive damages is therefore inappropriate as it is asserted against these defendants, based solely on negligence claims. Accordingly, Plaintiffs' claim for punitive damages, as asserted against the Camarena Defendants, should be dismissed.

### 3.   Claim for Attorneys' Fees

Under the American rule for attorney's fees, each party to a lawsuit must pay its own

attorney's fees unless otherwise provided by statute or agreement.  Trope v. Katz, 11 Cal. 4th 274, 278–79 (1995); see also Cal. Civ. Proc. Code § 1021.  California Code of Civil Procedure § 1033.5 further provides attorneys' fees are only recoverable as costs under § 1032 as permitted by contract, statute, or law.  Cal. Code Civ. Proc. §§ 1033.5(a)(10)(A)–(C).

The Camarena Defendants argue the FAC does not allege any contractual, statutory, or legal basis for the recovery of attorneys' fees as asserted against them.  (ECF No. 29 at 8–9.)  The Court agrees.   Further, Plaintiffs did not assert any substantive opposition to Defendants' argument in their briefing (see ECF No. 37 at 4), or at the hearing on the motion; rather they conceded the FAC does not allege facts supporting the recovery of attorneys' fees with respect to their negligence-based claims asserted against the Camarena Defendants.   The claim for attorneys' fees should therefore be dismissed, as asserted against the Camarena Defendants.

### 4.   Claim for Civil Penalties

Similarly, the Camarena Defendants argue no statutory authority permits the recovery of civil penalties against a healthcare provider such as Camarena Health or Camarena Health Foundation—especially based on claims of negligence, negligent infliction of emotional distress and negligent training and supervision—as alleged here against the Camarena Defendants.  (ECF No. 29 at 9.)  The Court again agrees.

In opposition, Plaintiffs do not identify any statutory basis for recovery of civil penalties against the Camarena Defendants based on the claims asserted against them (see ECF No. 37 at 4), nor did Plaintiffs argue any such basis existed at the hearing on the motion.  Nor is the Court aware of any such statutes.  Accordingly, Plaintiffs' claim for civil penalties should be dismissed as asserted against the Camarena Defendants.

### C.   Conclusion

For the foregoing reasons, the Court recommends the Camarena Defendants' motion to dismiss be granted, on the basis that Plaintiffs fail to allege sufficient facts against Camarena Health Foundation directly or under a successor liability theory, and they fail to allege facts establishing entitlement to punitive damages, attorneys' fees, or statutory penalties on any of the claims asserted against the Camarena Defendants (all of which are negligence-based).  Because

1   punitive damages, attorneys' fees, and statutory penalties are unavailable remedies for the claims

2   asserted against the Camarena Defendants as a matter of law, the motion to dismiss these

3   damages as asserted against the Camarena Defendants should be granted without leave to amend.

4   However, the Court recommends Plaintiffs be granted leave to amend their negligence claims

5   against Camarena Health Foundation, to the extent they can allege facts showing any actions on

6   the part of Camarena Health Foundation or demonstrating liability based on a successor liability

7   theory.

8                                          **V.**

9                   **CAPMC'S MOTION TO DISMISS (ECF NO. 34)**

10       Plaintiffs assert federal causes of action for state-created danger (claim 1) and interference

11   with parent/child relationship in violation of the Fourteenth Amendment (claim 2), as well as state

12   law causes of action for negligence (claim 3), negligent infliction of emotional distress (claim 4),

13   and negligent training and supervision (claim 5) against Defendant CAPMC.  (FAC at 3, 15–20.)

14       CAPMC moves to dismiss the <u>Monell</u> claims asserted against it on the basis that it is not a

15   state actor, Plaintiffs have not established CAPMC deprived them of any constitutional right, and

16   Plaintiffs fail to allege any particular policy or procedure to state a claim under <u>Monell</u>.  CAPMC

17   seeks dismissal of the state claims asserted against it on the basis that Plaintiffs' allegations are

18   conclusory and insufficient to establish that any breach of duty owed to Calley was the proximate

19   cause of her death.

20       **A.      Federal Claims Pursuant to 42 U.S.C. § 1983**

21       To prevail on a valid claim under § 1983, a plaintiff must prove that the conduct

22   complained of was committed by a person acting under color of state law, and that this conduct

23   deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws

24   of the United States.  See <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981); <u>Monell v. Dep't of Soc.</u>

25   <u>Servs.</u>, 436 U.S. 658, 690–95 (1978).  While local governmental units are considered "persons"

26   within the meaning of § 1983, a local government unit may not be held responsible for the acts of

27   its employees or officials under a respondeat superior theory of liability.   <u>Monell</u>, 436 U.S. at

28   690–91; <u>see also</u> <u>Bd. of Cnty. Comm'rs v. Brown (Brown)</u>, 520 U.S. 397, 403 (1997).  Thus,

1   municipal liability must rest on the actions of the municipality, and not of the actions of its

2   employees or officers.  See Brown at 403.

3        A Monell claim may be stated under three theories of municipal liability: (1) when

4   implementation of official policies or established customs inflict a constitutional injury; (2) when

5   omissions or failures to act amount to a local government policy of deliberate indifference to

6   constitutional rights; or (3) when a local government official with final policy-making authority

7   ratifies a subordinate's unconstitutional conduct.  Clouthier v. Cnty. of Contra Costa, 591 F.3d

8   1232, 1249–50 (9th Cir. 2010), overruled on other grounds by Castro v. Cnty of L.A., 833 F.3d

9   1060 (9th Cir. 2016).

10       To plead a Monell claim with sufficient particularity under the requirements set forth by

11  Iqbal and Twombly, allegations in a complaint "may not simply recite the elements of a cause of

12  action, but must contain sufficient allegations of underlying facts to give fair notice and to enable

13  the opposing party to defend itself effectively."  AE ex rel. Hernandez v. Cnty. of Tulare, 666

14  F.3d 631, 637 (9th Cir. 2012) (quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)) (citing

15  Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555).

16       Plaintiffs appear to seek to assert their Monell claims based on all three theories of

17  liability.  (See FAC at 12–13, 15–18.)  The Court shall therefore address each theory, in turn.  As

18  an initial matter, however, the Court must consider the threshold issue raised by CAPMC, as to

19  whether CAPMC is a "state actor" for purposes of Plaintiffs' § 1983 claim.[6]

20       1.    State Actor

21       **a.    Legal Standard**

22       Private entities may be considered state actors for purposes of § 1983 liability under

23  certain circumstances.  See, e.g., Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,

24  531 U.S. 288, 296–97 (2001) (collecting cases).  "The determination of whether a nominally

25  private person or corporation acts under color of state law is a matter of normative judgment, and

26  the criteria lack rigid simplicity."  Rawson, 975 F.3d at 747 (citations and internal quotations

27

28  [6] As the Ninth Circuit has explained, the "state actor" inquiry is the same as the "acting under color of state law"
    inquiry.  Rawson v. Recovery Innovations, Inc., 975 F.3d 742, 747 (9th Cir. 2020).

1   omitted).  Indeed, "[no] one fact can function as a necessary condition across the board ... nor is

2   any set of circumstances absolutely sufficient."  Lee v. Katz (Katz), 276 F.3d 550, 554 (9th Cir.

3   2002) (quoting Brentwood Acad., 531 U.S. at 295–96).  Rather, courts must engage in "sifting

4   facts and weighing circumstances" to answer what is "necessarily a fact-bound inquiry."  Lugar v.

5   Edmonson Oil Co., Inc., 457 U.S. 922, 939 (1982).

6         The Ninth Circuit explains the first part of the state actor inquiry requires identifying the

7   "specific conduct of which the plaintiff complains" in order to evaluate whether the entity was

8   acting under color of state law at the time of its conduct towards the plaintiff.  Id.  The appellate

9   court provides an example of this initial analysis in Rawson v. Recovery Innovations, Inc.:

10                  Here, Rawson seeks to hold Defendants liable for certain actions
                    relating to the 14-day and 90-day petitions, as well as his detention
11                  and forcible medication pursuant to the authority provided by those
                    petitions. The specific alleged conduct Rawson challenges includes
12                  involuntarily committing him without legal justification, knowingly
                    providing false information to the court, and forcibly injecting him
13                  with antipsychotic medications without his consent. The relevant
                    inquiry is therefore whether Defendants' role as custodians, as
14                  litigants, or as medical professionals constituted state action.

15   975 F.3d at 747.

16         To evaluate whether the defendant's conduct with respect to the plaintiff constituted state

17   action, the Ninth Circuit has discussed "at least four different general tests" developed by the

18   Supreme Court that can demonstrate state action by a private entity: "(1) public function; (2) joint

19   action; (3) governmental compulsion or coercion; and (4) governmental nexus."  Rawson, 975

20   F.3d at 747–48 (citing Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (internal citation

21   omitted)).  "Satisfaction of any one test is sufficient to find state action, so long as no

22   countervailing factor exists."  Id. at 748.  The relevant inquiry as to whether the entity's actions

23   constituted state action thus hinges on the specific alleged conduct and role of the entity, and

24   requires a fact-intensive, totality of the circumstances approach.  See id. at 747.

25         As the Ninth Circuit explains, "[t]he public function test is satisfied only on a showing

26   that the function at issue is both traditionally and exclusively governmental."  Id. at 748 (citing

27   Kirtley, 326 F.3d at 1093; Katz, 276 F.3d at 555 (internal quotations omitted)) (discussing state's

28   police powers and *parens patriae* powers with respect to protecting the health and safety of

persons suffering from behavioral health disorders and to protect public safety in finding that private medical contractor defendants' involuntary psychiatric commitment of plaintiff was "under color of state law"); see also West v. Atkins, 487 U.S. 42 (1988) (holding private parties may act under color of state law when they exercise powers traditionally held by the state, and finding private contract physician rendering treatment services for prisoners at state prison acted under color of law).

The joint action and close nexus tests may be satisfied "where the court finds a sufficiently close nexus between the state and the private actor so that the action of the latter may be fairly treated as that of the State itself, or where the State has so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." Id. (citing Jensen v. Lane Cnty., 222 F.3d 570, 575–58 (9th Cir. 2000); Jackson v. Metro. Edison Co., 419 U.S. 345, 350, 357–58 (1974) (internal quotations omitted)). Stated another way, "[i]n order to be considered state action, when a private actor participates in a governmental act, the court must find a sufficiently close nexus between the state and the private actor so that the action of the latter may be fairly treated as that of the State itself." Jensen, 222 F.3d at 575 (quotation marks and citation omitted). "[D]etailed regulation of and substantial funding for private actors are not sufficient to transform the party's conduct into state action." Id.; but see Rawson, 975 F.3d at 755–56 ("state action may lie in private conduct that is affirmatively commanded by state protocols"). Rather, under these tests, a private entity may be considered a state actor "only if its particular actions are 'inextricably intertwined' with those of the government." Pasadena Republican Club v. W. Just. Ctr., 985 F.3d 1161, 1167 (9th Cir. 2021) (citing Brunette v. Humane Society of Ventura Cnty., 294 F.3d 1205, 1211 (9th Cir. 2002)).

Finally, the governmental compulsion or coercion test may be satisfied "where the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Id. (citing Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (internal quotations omitted)).

Regardless of the test, however, the Ninth Circuit stressed that the most important function of the inquiry "is always whether the defendant has exercised power possessed by virtue

1   of state law and made possible only because the wrongdoer is clothed with the authority of state

2   law."  Pasadena Republican Club, 985 F.3d at 1167 (quoting Rawson, 975 F.3d at 747 (internal

3   quotations omitted)).

4       **b.    Analysis**

5       Here, the Court notes neither party identifies which particular test they purport to apply in

6   their state actor inquiries, but instead appear to combine portions of each in their arguments.

7   Indeed, CAPMC does not appear to identify any test, and Plaintiffs suggest their allegations

8   "satisfy [all of] the relevant tests set forth by the Supreme Court and Ninth Circuit: CAPMC is

9   controlled by an agency of the state, performs public functions, and has a strong governmental

10  nexus…."  (ECF No. 40 at 9.)  These arguments are, therefore, generally unavailing.  For the

11  same reason, the cases relied upon by the parties for general findings that an entity was or was not

12  a state actor under the specific facts of that case are not particularly persuasive in the instant

13  matter.  At the hearing, Plaintiffs focused their argument on the "traditional government functions

14  test," which the Court construes to be a reference to the public function test.  However, the

15  parties' mostly present argument as to CAPMC's ties to County and whether County exerted

16  control over CAPMC's operations, in general, while neglecting to examine CAPMC's functions

17  within the context of its actions specifically related to Calley.

18      Applying the Ninth Circuit's test, the Court first examines the "specific conduct of which

19  the plaintiff complains."  Rawson, 975 F.3d at 747.  Here, Plaintiffs allege Calley told CAPMC

20  agents/employees about Mr. Garay's pattern of abuse and death threats (FAC ¶ 59) and in

21  response, CAPMC "encouraged and aided" Calley in leaving her husband (id. ¶ at 62), told

22  Calley it would protect her and the children and keep her safe (id. at ¶ 64), and assisted Calley in

23  drafting and obtaining a restraining order against Mr. Garay in June 2020 (see id. at ¶¶ 66, 68);

24  CAPMC's employee Ms. Rodriguez accompanied Calley to a family court proceeding in July

25  2020 (id. at ¶ 70); CAPMC provided Calley with lodging at a "CAPMC facility" (see id. at ¶ 91);

26  and CAPMC drove Calley and the children to Calley's medical appointment at Camarena Health

27  on July 14, 2020, "in an easily-identifiable vehicle staffed with one unarmed female employee

28  who had been employed for only approximately 6 months at the time of the appointment" (id. at

1   ¶¶ 92, 106, 108).   It thus appears the conduct alleged may be characterized as provision of

2   domestic violence shelter services.  The relevant inquiry, therefore, is whether CAPMC's role as

3   provider of domestic violence services and transportation to Calley constituted state action.[7]  See

4   Rawson, 975 F.3d at 747.  Under this context, the Court examines the parties' arguments about

5   CAPMC's relationship with County.

6        CAPMC argues Plaintiffs' allegations are insufficient to establish it is a state actor in its

7   provision of victim services, including its operation of a domestic violence shelter because, for

8   example, Plaintiffs allege no facts showing County and CAPMC had a contract to provide those

9   victim services, that County exercised any control over how CAPMC provided the services,

10  and/or how CAPMC operated its domestic violence shelter.  (ECF No. 34 at 8–9.)  In opposition,

11  Plaintiffs point to several allegations in the FAC which they argue demonstrate CAPMC is a

12  "quasi-government agency."  (See ECF No. 40 at 2.)  For example, while CAPMC is a private

13  501(c)(3) corporation (FAC ¶¶ 25, 28), Plaintiffs allege it is "primarily funded through federal,

14  state, and local government units"; County "has executed contracts with [CAPMC] to provide

15  various services to the community" (FAC ¶¶ 27, 29, 30); CAPMC's bylaws are ratified by the

16  Madera County Board of Supervisors and a third of CAPMC's directors are public officials,

17  including its executive director (id. at ¶¶ 31–34); and CAPMC allegedly provides victim services,

18  including operating a women's shelter in Madera County (id. at ¶ 35).

19       The Court finds Plaintiffs have the better argument.  Contrary to CAPMC's argument,

20  Plaintiffs have alleged the existence of a contractual relationship between CAPMC and County.

21  Thus, liberally construing the FAC's allegations, as the Court must at the motion to dismiss stage,

22  CAPMC provided Calley and her children lodging at its domestic violence shelter pursuant to its

23  contractual provisions with County, and such services were "primarily" funded by "federal, state,

24  and local government units."  Given these factual allegations, and considering the County's

25  alleged oversight with respect to selection of key management positions, joint development of the

26  _____

27  [7] Based on this analysis, Defendant's argument that the majority of CAPMC's services rendered are not geared
    towards domestic violence services, but a number of other services as well, is unpersuasive because, while it may
    constitute one relevant consideration under the totality of the circumstances, it does not alone satisfy the inquiry into
28  the specific alleged conduct and role CAPMC played with respect to Plaintiffs in this case.

bylaws for CAPMC's operation, the Court finds Plaintiffs have sufficiently alleged facts to support a finding that CAPMC provided victim services to Calley as a state actor under the joint action and governmental nexus tests.  Furthermore, while the discovery of further evidence or a reasonable jury might ultimately find this connection insufficient to establish CAPMC's actions were "inextricably intertwined" with County's, the Court is mindful that the state actor inquiry is a "necessarily fact-bound inquiry."  Rawson, 975 F.3d at 747.  Thus, while CAPMC may prevail on this issue at trial or the summary judgment stage, at the instant early stage of this litigation and for purposes of surviving a challenge to the pleadings, the Court concludes Plaintiffs have alleged sufficient facts to establish the state actor element of their § 1983 claims.

Having established Plaintiffs allege sufficient facts to establish the threshold issue of whether CAPMC acted under color of state law at the times relevant to this action, the Court evaluates Plaintiffs' § 1983 claims against CAPMC with respect to the three theories of municipal liability under Monell.

### 2.   Official Policy or Custom

To establish liability for governmental entities based on an official policy or custom, a plaintiff must show: (1) that the plaintiff "possessed a constitutional right of which [he or she] was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation."  Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks omitted); see also Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008) (quoting Ulrich v. City & Cnty. of S.F., 308 F.3d 968, 984–85 (9th Cir. 2002)) (holding a plaintiff may establish municipal liability based on an official policy or custom by demonstrating "the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.' ").

As to Plaintiff's Monell claim based on the official policy theory of liability, CAPMC argues Plaintiffs fail to state a claim because they do not allege sufficient facts to establish CAPMC deprived them of any constitutional right or that the deprivation was "deliberate," nor do Plaintiffs allege the existence of any particular policy or procedure.  (ECF No. 34 at 9–12.)

1

   **a.   Deprivation of Constitutional Right**

2

   As noted by the Court, to state a <u>Monell</u> claim, a plaintiff must establish she "possessed a

3

constitutional right of which [she] was deprived."  Plaintiffs' first <u>Monell</u> cause of action claims

4

deprivation of her Fourteenth Amendment rights arising from a state-created danger; their second

5

<u>Monell</u> cause of action claims a deprivation of Fourteenth Amendment rights by interference with

6

the parent/child relationship.

7

   CAPMC argues Plaintiffs fail to allege any facts to establish this element, *i.e.*, that any

8

action by CAPMC caused a deprivation of Plaintiffs' rights.  The Court agrees.

9

   (i)   <u>State-Created Danger (Claim 1)</u>

10

   Plaintiffs assert Calley "had a constitutional right to be free from state-created danger."

11

(FAC ¶ 120.)  This is not an entirely accurate statement of law.  Plaintiff's state-created danger

12

claim is rooted in the substantive due process clause of the Fourteenth Amendment.  <u>See</u> <u>Murguia</u>

13

<u>v. Langdon</u>, 61 F.4th 1096, 1106 (9th Cir. 2023).  The Due Process Clause provides, "No State

14

shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. Const.

15

amend. XIV, § 1.  However, as explained by the Ninth Circuit, "the due process clause is a

16

*limitation* on state action rather than a *guarantee of minimum levels* of state protections, so the

17

state's failure to prevent acts of private parties is typically insufficient to establish liability under

18

the Due Process Clause."  <u>Murguia</u>, 61 F.4th at 1106 (emphasis in original).  Thus, liability based

19

on a state-created danger is an exception to the general rule that the failure to act to protect an

20

individual from private violation does not deprive that individual of substantive due process under

21

the Fourteenth Amendment.  <u>Id.</u> at 1108.

22

   Elaborating on this rule, the Ninth Circuit explained that the state-created danger

23

exception only applies "in narrow circumstances," <u>id.</u> at 1108:

24

25

26

27

28

> The state-created danger exception has its origins in *DeShaney* [*v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)], in which the United States Supreme Court held that social workers and local officials were not liable under § 1983 on a failure-to-act theory for injuries inflicted on a child by his father … The state actors had received complaints that the child was abused by his father but failed to remove the child from his father's custody … The court reasoned that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part

24

1
2
3
4
5

> in their creation, nor did it do anything to render him any more
> vulnerable to them." ... The court acknowledged that the state once
> took temporary custody of the child and then returned him to his
> father, but reasoned that the state "placed [the child] in no worse
> position than that in which he would have been had it not acted at
> all[.]"  Given that the state actors did not create or enhance any
> danger to the child, the state did not have a constitutional duty to
> protect him from the private violence inflicted by his father.

6
7

Murguia, 61 F.4th at 1110–11 (citing DeShaney, 489 U.S. at 191, 201 (1989) (internal citations omitted)).

8
9
10
11
12
13
14
15
16
17
18

Accordingly, to establish a deprivation of substantive due process rights under the "state-created danger" exception, a plaintiff must establish: (1) affirmative conduct on the part of the state in placing the plaintiff in "an actual, particularized danger that [the plaintiff] would not otherwise have faced"; and (2) that the state acted with deliberate indifference to a known or obvious danger.  Id. at 1111.  Furthermore, the plaintiff's ultimate injury must have been foreseeable to the defendant.  Id.; see also Martinez v. City of Clovis, 943 F.3d 1260, 1271 (9th Cir. 2019) (identifying three elements: (1) affirmative conduct creating or enhancing a danger to the plaintiff, (2) foreseeability, and (3) deliberate indifference to the danger).  "In other words, the state actor must 'know[ ] that something is going to happen but ignore[ ] the risk and expose[ ] [the plaintiff] to it.' "  Id. at 1111 (quoting L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir. 1996) (emphasis in original)).

19
20
21
22
23
24
25

Plaintiffs argue CAPMC created a danger to Calley, in the form of her abusive husband eventually murdering her on July 14, 2020, in two ways: first, by encouraging Calley to leave her husband and providing victim services—such as the domestic violence shelter and assistance in obtaining a restraining order against Mr. Garay—prior to that date, thus enraging Mr. Garay and increasing the likelihood that he would seek to physically harm Calley; and second, by facilitating Calley's transportation to Camarena Health on that fateful day in which Mr. Garay lied in wait for Calley in the parking lot of the Camarena clinic and ultimately shot her.[8]  However, none of these

26
27
28

---

[8] Plaintiffs additionally argued at the hearing that CAPMC's affirmative actions to provide Calley with victim services created a "special relationship" triggering the duty to protect.  This appears to reference the second exception to the general rule that failure to protect an individual from private violence does not violate the substantive due process clause of the Fourteenth Amendment, the "special-relationship exception."  However, neither the FAC nor Plaintiffs' opposition to CAPMC's motion identifies the special relationship exception as an alternate theory of

1    allegations are sufficient to satisfy the aforementioned elements.

2         As to the first element, Plaintiff does not allege facts showing CAPMC created a greater

3    danger to Calley by helping to remove her from a domestic violence home situation and obtain

4    legal protections against her abuser; to the contrary, these actions appear to have created a more

5    safe and secure environment for Calley.  Mr. Garay, as an abusive spouse, was undisputedly

6    enraged by Calley's actions; however, Mr. Garay's anger and dangerous behavior resulted from

7    his own mental state, and was not a direct result of CAPMC's actions; indeed, the allegations

8    suggest Mr. Garay had a tendency to become dangerously enraged at Calley for various reasons,

9    or even for no reason at all.  Nor do the facts alleged demonstrate that Calley would not have

10   faced the same danger—even fatal danger—if CAPMC had not taken steps to assist Calley in

11   leaving that environment.  Indeed, the Court notes Plaintiffs' allegations describing the "grievous

12   abuse and bodily harm" Calley suffered repeatedly suffered from Mr. Garay while living with

13   him—including being punched, choked, assaulted with objects such as a fire poker, metal bat,

14   chainsaw blade, and steel-toed boots, and threatened at gunpoint (see FAC ¶¶ 40, 44, 55, 56)—

15   existed well before she reached out to CAPMC and sought its assistance.  Thus, while it is not

16   unsympathetic to these tragic circumstances, as was determined by the Supreme Court in

17   DeShaney, this Court cannot conclude that CAPMC, in providing victim services to Calley,

18   placed her in "an actual, particularized danger that [she] would not otherwise have faced."

19   Murguia, 61 F.4th at 1111.

20        The mere act of CAPMC driving Calley to her medical appointment on July 14, 2020, is

21   even more attenuated from the ultimate harm of Calley being shot by Mr. Garay.  Other than the

22   conclusory allegations that CAPMC "knew or should have known" that Mr. Garay was likely

23   going to kill Calley that day, there are no factual allegations showing that CAPMC had any

24   reason to know Mr. Garay was aware of the specifics of Calley's medical appointment that day,

25   or that he would act upon that information to lie in wait for Calley in the parking lot outside of the

26   Monell liability against CAPMC.  Accordingly, the Court declines to address this argument herein.  Schneider, 151
27   F.3d at 1197 n.1.  Regardless, the Court notes the special relationship exception only applies when the state actor
     takes a person into its custody and holds him there against his will.  Murguia, 61 F.4th at 1109.  Since there is zero
28   indication that Calley was ever taken into custody by CAPMC, or held at the shelter against her will, this exception
     does not appear to apply.

Camarena clinic and ultimately kill her.[9]  The FAC does not allege that Camarena had any contact with anyone from CAPMC with respect to Calley's medical appointment or that CAPMC was notified by anyone that Mr. Garay had been informed about the appointment; nor does the FAC allege any facts establishing a relationship between CAPMC and Camarena, akin to that asserted between CAPMC and County, in support of Plaintiffs' allegation that CAPMC should have known that Mr. Garay would be there that day.

The second element is similarly unsatisfied by the factual allegations.  Relatedly, because there is no indication that CAPMC was aware Mr. Garay had knowledge of Calley's appointment or otherwise posed any particularized, imminent threat (beyond the threat he always posed to Calley as an abusive spouse), the Court cannot impute to CAPMC the requisite mental state to establish deliberate indifference.

Because the allegations are insufficient to satisfy the elements of the state-created danger exception, Plaintiffs fail to establish any constitutional deprivation by CAPMC.  For this reason alone, their Monell claim predicated on this theory fails.

(ii)     Interference with Parent/Child Relationship (Claim 2)

Plaintiffs indicate their Monell claim based on alleged interference with the parent/child relationship arises from the Fourteenth Amendment.  (FAC at 18.)

The Supreme Court has recognized the Fourteenth Amendment's Due Process Clause protects the liberty interest "of parents in the care, custody, and control of their children."  Troxel v. Granville, 530 U.S. 57, 65 (2000); see also Santosky v. Kramer, 455 U.S. 745, 753 (1982).  The Ninth Circuit has also noted the Constitution protects "the parent-child relationship from unwanted interference by the state."  Kirkpatrick v. Cnty. of Washoe, 843 F.3d 784, 788 (9th Cir. 2016); see also Lee, 250 F.3d at 685.  Thus, "[p]arents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the

---

[9] Like the Camarena Defendants, CAPMC alleges additional facts in its motion to dismiss that do not appear in the FAC, such as the allegation that Mr. Garay was released from jail and returned to the family home the day before Calley's murder.  (See ECF No. 34 at 5.)  Incidentally, the FAC also alleges no facts showing that CAPMC knew Mr. Garay was arrested and detained in jail in the first place.  For the same reasons previously discussed, the Court shall not consider such new allegations for purposes of evaluating the instant Rule 12(b)(6) motion to dismiss.  Schneider, 151 F.3d at 1197 n.1.

1    companionship and society of their child or parent through official conduct."  Lemire v. Cal.

2    Dept. of Corr. & Rehab., 726 F.3d 1062, 1075 (9th Cir. 2013) (citations omitted).  However,

3    "only official conduct that shocks the conscience is cognizable as a due process violation."  Id.

4    (citations and internal quotations omitted).  "Just as the deliberate indifference of prison officials

5    to the medical needs of prisoners may support Eighth Amendment liability, such indifference may

6    also rise to the conscience-shocking level required for a substantive due process violation."  Id.

7    (citations and internal quotations omitted).

8        Here, the parties raise the same arguments with respect to this purported constitutional

9    deprivation as they do under the state-created danger claim.  The Court finds Plaintiffs'

10    allegations do demonstrate an interference in the parent-child relationship occurred on July 14,

11    2020, when Mr. Garay shot and killed Calley.  However, the allegations do not establish CAPMC

12    caused this deprivation.  At most, Plaintiffs allege CAPMC organized the transport for Calley and

13    her children to Camarena Health that day.  However, it was not the van ride to the clinic that

14    killed Calley; it was Mr. Garay.  Further, as previously discussed, no non-conclusory factual

15    allegations establish CAPMC knew or had reason to know that Mr. Garay would show up at

16    Calley's medical appointment and shoot her in the clinic parking lot.  Nor do Plaintiffs allege any

17    facts showing that, once Mr. Garay had approached and confronted Calley in the parking lot, the

18    CAPMC employee deliberately ignored the danger to Calley, thus permitting Mr. Garay to shoot

19    her; indeed, the FAC does not identify any actions the CAPMC driver could have taken at that

20    point to protect Calley from her fully-armed abusive spouse.  On this record, the Court cannot

21    conclude Plaintiffs state a Monell cause of action based on any deprivation of familial

22    relationship, as asserted against Defendant CAPMC.

23        **b.**    **Policy**

24        As to this prong, CAPMC argues Plaintiffs fail to allege any particular policy or procedure

25    to state a claim under Monell.[10]  The Court agrees.

26        The custom or policy must be so "persistent and widespread as to practically have the

27

---

28    [10] Indeed, the Court notes that, at the hearing, Plaintiffs mainly appeared to argue Monell liability existed based on the theory of "no policy," or a failure to train.  This theory of Monell liability is discussed in the next section.

force of law."  Connick v. Thompson, 563 U.S. 51, 61 (2011); see also Price, 513 F.3d at 966 (stating that plaintiffs may "establish municipal liability by demonstrating that ... the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity") (internal quotation marks omitted). Put another way, the practice must have been going on for a sufficient amount of time, such that the "frequency and consistency [of] the conduct has become a traditional method of carrying out policy."  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996); see also McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000) ("A plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee.").

Upon careful review of the FAC, the Court cannot identify any non-conclusory allegation describing a policy CAPMC had in effect at the time of the incident which contributed to Calley's death.  At most, Plaintiffs allege CAPMC

> placed [Calley] (and other similarly situated victims) in particularized risk by adopting and acting in accordance with official policies and procedure and permitting widespread and longstanding practices and customs, that ultimately gave rise to and caused [Calley's] death, including but not limited to: essentially communicating to [Calley's] abusive husband that [Calley] would testify in a criminal prosecution against him; advising [Calley] that she was a witness against her abusive husband and informing her that she could and would be subpoenaed and subjected to compulsory process in a criminal case against him; encouraging and aiding and abetting [Calley] in leaving the home; encouraging and aiding and abetting in removing the children from the husband's custody; assisting and aiding and abetting in obtaining a restraining order against the abuser; prohibiting him from seeing the children, further enraging the husband; assuring [Calley] that her location and that of her children would not be disclosed to her abusive husband, despite knowingly instituting policies and procedures and failing to institute policies and procedures that broke those promises; causing [Calley] and her children to be housed in temporary accommodations, and then a CAPMC-run shelter, while failing to keep her whereabouts secret; knowingly failing to provide adequate security and safety for [Calley] while taking her out in public despite promises to her to keep her safe; and affirmatively disclosing her location to her abusive husband.

(FAC ¶ 126.)  This is the only allegation in the FAC that purports to describe any policy.  Yet, the allegation that CAPMC placed "and other similarly situated victims" in danger is largely

conclusory, as is the phrase "assuring [Calley] that her location and that of her children would not be disclosed to her abusive husband, despite knowingly instituting policies and procedures and failing to institute policies and procedures that broke those promises."  Again, no policies or procedures are actually described.

Further, to the extent Plaintiffs contend the factual description of CAPMC's actions towards Calley (such as housing her in a shelter, failing to keep her whereabouts secret)[11] constitute a policy, the Court finds such a contention unavailing.  The Ninth Circuit has held that a custom or practice "can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished."  Hunter v. Cnty. of Sacramento, 652 F.3d 1225, 1233, 1236 (9th Cir. 2011) (internal quotations omitted).  Here, however, the FAC contains no allegations suggesting Plaintiffs' case amounts to anything more than a "single occurrence of unconstitutional action by a non-policymaking employee."  McDade, 223 F.3d at 1141; Long v. Cnty. of L.A., 442 F.3d 1178, 1186 (9th Cir. 2006).

At most, Plaintiffs allege Ms. Rodriguez's longstanding "incompetence" and "dishonesty," demonstrates the existence of a longstanding policy.  However, Plaintiffs do not allege multiple incidents in which the abusive partners of domestic violence victims receiving services and shelter from CAPMC were able to track down and harm their partners due to a disclosure by CAPMC of the victim's location.  Rather, Plaintiffs' claim appears to be based on the one alleged incident that happened to them.  Moreover, there are no allegations indicating that the "errant municipal officers were not discharged or reprimanded" after each purported incident.  To the contrary, Plaintiffs allege Ms. Rodriguez, the CAPMC employee directly involved with Calley's case, was terminated by CAPMC after Calley's death.  (See FAC ¶ 98 (alleging Ms. Rodriguez was "fired for 'incompetency' and 'dishonesty' after [Calley's] death).)  Therefore,

---

[11] In addition, the Court notes these purported "facts" appear to be little more than "legal conclusions cast in the form of factual allegations."  Chunie, 788 F.2d at 643 n.2.  For example, Plaintiffs allege no facts to support their conclusion that CAPMC broke its promise to not disclose Calley's location to her husband; indeed, there are no facts alleged that Mr. Garay ever learned the location of the CAPMC shelter at which Calley and the children were staying.  Similarly, there is no factual support for the conclusion that CAPMC affirmatively disclosed Calley's location (at the medical appointment or any other time) to her husband.  To the contrary, the FAC expressly alleges an employee from Camarena Health disclosed the location and specifics of Calley's medical appointment to Mr. Garay.  Regardless, even if these statements were properly supported with factual allegations, they remain insufficient to establish a policy or practice, for the reasons described herein.

1    Plaintiffs fail to demonstrate their alleged injury resulted from a "permanent and well settled

2    practice." Id. Thus, Plaintiffs' Monell claims against CAPMC fail because they do not allege

3    facts sufficient to establish the existence of any CAPMC policy or procedure.

4            **c.**        **Deliberate Indifference**

5          It is not sufficient for a plaintiff to identify a custom or policy, attributable to the

6    municipality, that caused his injury; a plaintiff must also demonstrate that the custom or policy

7    was adhered to with "deliberate indifference to the constitutional rights" of the individual—here,

8    the domestic violence victims receiving services and shelter from CAPMC. City of Canton, Ohio

9    v. Harris, 489 U.S. 378, 392 (1989). Thus, to establish deliberate indifference, Plaintiffs must

10    show a deliberate choice "to follow a course of action … made from various alternatives by the

11    official or officials responsible for establishing final policy with respect to the subject matter in

12    question." Castro, 833 F.3d at 1075 (internal citations and quotation marks omitted).

13    Furthermore, Plaintiffs must show a "continued adherence by policymakers to an approach that

14    they know or should know has failed to prevent tortious conduct by employees. Long, 442 F.3d

15    at 1186. To this point, the deliberate indifference inquiry for establishing Monell liability "is

16    always an objective standard." Castro, 833 F.3d at 1076. The Supreme Court has articulated a

17    standard permitting liability on a showing of notice: "Where a § 1983 plaintiff can establish that

18    the facts available to city policymakers put them on actual or constructive notice that the

19    particular omission is substantially certain to result in the violation of the constitutional rights of

20    their citizens, the dictates of *Monell* are satisfied." City of Canton, 489 U.S. at 396.

21          Having established Plaintiffs fail to identify a specific policy or practice by CAPMC that

22    they contend caused a constitutional deprivation, the deliberate indifference element is also

23    unmet. Furthermore, even assuming establishment of a policy, the Court notes Plaintiffs do not

24    allege facts identifying any alternative "courses of action" CAPMC could have chosen to follow,

25    instead of the alleged policy it adopted, which would have prevented the purported deprivation.

26    See Castro, 833 F.3d at 1075. Thus, even if Plaintiffs established a current policy was

27    inadequate, without identifying any better options, Plaintiffs cannot establish the purported policy

28    was deliberately chosen in conscious disregard to consequences. See id.

Plaintiffs assert multiple allegations that CAPMC knew of the risk Mr. Garay posed to Calley because they have provided victim services to domestic violence victims and therefore, from experience, know estranged spouses are dangerous; moreover, because Ms. Rodriguez assisted Calley at a family court matter against Mr. Garay and requested security when leaving the courthouse, CAPMC was aware of the specific threat Mr. Garay posed.  (See, generally, FAC.)  Such allegations too broadly define the "risk or harm" relating to the instant action; here, the alleged constitutional deprivation was Calley's death.  Nor are these allegations of purported notice linked to any policy or practice that caused Calley's death.  Alternatively, to the extent Plaintiffs allege CAPMC "knew or should have known" that the details of Calley's health appointment were provided to Mr. Garay, or that Mr. Garay was going to attack Calley after her health appointment, as the Court previously discussed, such allegations are impermissibly conclusory and lack any supporting factual allegations.  On this record, the Court cannot conclude Plaintiffs have established CAPMC adopted any policy with deliberate indifference to its domestic violence victims' rights.

### d.    Moving Force

Finally, there must be a "direct causal link" between the policy or custom and the injury.  Anderson, 451 F.3d at 1070 (citations omitted).  Again, no policies or procedures are actually described.  Therefore, the Court cannot discern a "direct causal link" between any alleged policy and Plaintiffs' purported deprivation.  City of Canton, 489 U.S. at 388.

For each of these reasons, the Monell claim premised on implementation of a policy or procedure fails.

### 3.    Omissions/Failures to Act

Alternatively, Plaintiffs contend Monell liability is premised on a lack of policy, or failure to train.  (See FAC ¶¶ 136–39.)

Plaintiffs allege CAPMC

> maintained a policy of failing to train and supervise its employees and agents to prevent violations of the law and prevent the kind of harm that befell [Calley] … CAPMC … failed to train and supervise employees and agents including but not limited to [Ms. Rodriguez], her subordinates and supervisees, and others, to avoid

1

2

3

4

> the kind of harm that befell [Calley] … CAPMC … knew or should have known that Ms. Rodriguez and her subordinates, through their acts and omissions, put abused women like [Calley] at risk … [and] CAPMC … nevertheless failed to adequately supervise and train Ms. Rodriguez and her subordinates and others, causing and helping to cause the harm that befell [Calley].

5

(Id.)

6

7

8

9

"[U]nder certain circumstances, a local government may be held liable under § 1983 for acts of 'omission,' when such omissions amount to the local government's own official policy." Clouthier, 591 F.3d at 1249 (citation omitted).   The Ninth Circuit specifically addressed the circumstances under which a Monell failure to train claim could be asserted:

10

11

12

13

14

15

16

> [1] The first is a deficient training program, intended to apply over time to multiple employees.   [2] The continued adherence by policymakers to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. Further, [3] the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

17

Long, 442 F.3d at 1186 (citing Brown, 520 U.S. at 407–08).

18

19

20

21

Here, as the Court has noted, Plaintiffs fail to establish any constitutional deprivation; therefore, their first and second causes of action fail under any Monell theory of liability.   In addition, the Court notes Plaintiffs have not alleged facts sufficient to establish the other elements of a failure to train Monell claim, as discussed herein.

22

**a.      Deficient Training Program**

23

24

25

26

The Supreme Court has described a "deficient" training program as one in which the entity "has failed to train its employees to handle recurring situations presenting an obvious potential for [the identified constitutional deprivation]."   Brown, 520 U.S. at 398 (citation omitted).

27

28

Here, Plaintiffs generally allege a deficiency in training by Defendants, but do not identify any training program, or its alleged deficiencies.  Plaintiffs' allegations that CAPMC's training

1  policies fail to train its employees to "prevent violations of the law" and "prevent the kind of

2  harm that befell [Calley]" are vague conclusory.  It is also unclear what "recurring situation"

3  Plaintiffs are asserting.

4         **b.      Knowledge ("Deliberate Indifference")**

5         As noted, the continued adherence by policymakers to an approach that they know or

6  should know has  failed to prevent tortious conduct by employees may establish the conscious

7  disregard for the consequences of their action—the "deliberate indifference"—necessary to

8  trigger municipal liability.  Long, 442 F.3d at 1186.  The Court does not find allegations in the

9  FAC demonstrating CAPMC was aware that its provision of court representation, shelter, or

10  transportation services would result in the assault and/or death of victims receiving its services.

11  Plaintiffs' lone allegation that CAPMC "knew or should have known" is conclusory and therefore

12  insufficient.  Further, Plaintiffs fail to establish the deliberate indifference element under this

13  theory of Monell liability for the reasons previously discussed.

14         **c.      Pattern of Tortious Conduct ("Moving Force")**

15         The Court notes Plaintiffs also fail to allege facts sufficient to establish the moving force

16  element.

17         Plaintiffs claim CAPMC's training programs are deficient because they do not train

18  employees to guard against disclosure of the whereabouts of domestic violence victims, including

19  healthcare appointment times, dates, and locations, to abusive spouses.  (FAC ¶¶ 93, 94, 96.)

20  This allegation is problematic, however, because Plaintiffs do not allege facts showing recurring

21  situations in which CAPMC employees have disclosed the whereabouts of domestic violence

22  victims under its care (including healthcare appointment times, date, and locations), resulting in

23  death or severe harm by the abuser spouses.  Indeed, Plaintiffs do not even allege CAPMC

24  disclosed such information to the abuser in *this* situation; rather, Plaintiffs alleged it was a

25  Camarena Health employee who disclosed the information to Mr. Garay.  Further, there are no

26  factual allegations showing CAPMC was aware Camarena Health had disclosed the details of

27  Calley's medical appointment to Mr. Garay, or that it had anything to do with Camarena Health's

28  disclosure of that information.  As a result, as previously noted, Plaintiffs' case does not amount

1   to anything more than a "single occurrence of unconstitutional action."  McDade, 223 F.3d at

2   1141; Long, 442 F.3d at 1186.

3         At the hearing, Plaintiffs also argued CAPMC has deficient policies and procedures with

4   respect to its provision of transportation services to domestic violence victims.  They allege

5   CAPMC used "an easily identifiable vehicle" to drive Calley to her medical appointment, with no

6   security, and only "a single unarmed female employee who had been employed for only

7   approximately 6 months at the time of the appointment."  (FAC ¶¶ 106, 108.)  Yet it is not clear

8   to the Court how the manner of transportation provided by CAPMC constitutes tortious conduct,

9   or how CAPMC's transportation policies present an "obvious potential for [the identified

10   constitutional deprivation]."  Plaintiffs have not alleged other individuals receiving CAPMC's

11   transportation services were harmed or killed by their abusive partners, and there is no indication

12   that transportation services would result in death if the abuser was not made aware of the

13   destination of the client.  Thus, as previously noted, there is no showing that CAPMC's provision

14   of transportation services was the moving force behind any alleged constitutional violation.

15         Plaintiffs also claim CAPMC failed to adequately train and supervise Ms. Rodriguez, and

16   wrongly hired and retained her.  (FAC ¶ 102.)  In support of this claim, Plaintiffs allege Ms.

17   Rodriguez had a repeated and ongoing history of acts of "incompetency" and "dishonesty" which

18   predated Calley's case and placed abuse victims in grave physical danger.  (Id. at ¶¶ 99, 100.)

19   For example, Plaintiffs allege Ms. Rodriguez failed to arrange for specific security steps to be

20   taken to protect Calley and the children after appearing with and assisting Calley in family court.

21   (Id. at ¶¶ 75, 76.)  But the FAC does not allege Ms. Rodriguez's conduct caused constitutional

22   deprivations for other clients, nor do Plaintiffs allege other employees trained by CAPMC caused

23   constitutional violations through their assistance at family court proceedings or the provision of

24   other services after receiving the same training as Ms. Rodriguez.  As Monell liability requires a

25   "pattern of tortious conduct by inadequately trained employees … rather than a one-time

26   negligent administration of the program or factors peculiar to the officer involved in a particular

27   incident," Plaintiffs' allegations concerning Ms. Rodriguez are insufficient to satisfy this element.

28   ///

35

1        4.    Ratification

2        Monell liability can be established if the tortfeasor was an official who "fairly represent[s]

3    official policy" for the state actor, or if such an official ratified the tortfeasor's actions.  Price, 513

4    F.3d at 966.

5        Here, even assuming the other Monell elements are satisfied, Plaintiffs assert no allegation

6    that the unidentified driver of the transportation vehicle on July 14, 2020, had policymaking

7    authority for CAPMC.  The Court notes Plaintiffs allege Ms. Rodriguez, prior to her termination,

8    did have policymaking authority; however, for the same reasons previously discussed, they have

9    not alleged facts showing any action by Ms. Rodriguez was the driving force resulting in Calley's

10   death on July 14, 2020.  In addition, the Court notes Plaintiffs name several other individuals,

11   each of whom Plaintiffs claim "was a final policymaker or a subordinate who had been delegated

12   final policymaking authority for purposes of this claim."  (See FAC ¶¶ 128–35.)  However,

13   Plaintiffs do not allege any of these individuals "ratified" any particular action by a CAPMC

14   employee.  Therefore, Plaintiffs have insufficiently alleged an "official policymaker" or

15   ratification theory of Monell liability.

16       The Court notes some skepticism as to whether Plaintiffs can cure the aforementioned

17   defects with their Monell claims with respect to Defendant CAPMC.  However, in an abundance

18   of caution, the Court shall recommend that Plaintiffs be granted a final opportunity to amend

19   these claims.

20       **B.**    **State Law Claims[12]**

21       As noted, Plaintiffs assert state law causes of action for negligence (claim 3), negligent

22   infliction of emotional distress (claim 4), and negligent training and supervision (claim 5) against

23   Defendant CAPMC.

24

25   [12] The Court notes an alarming dearth of citation to legal authorities in support of the parties' respective positions on the issue of whether Plaintiffs stated any negligence-based claims.  CAPMC cites to exactly *one* California appellate case (in its reply brief); whereas Plaintiffs rely on no legal authority whatsoever in support of their position opposing dismissal.  This is surprising as negligence is a common law tort.  Nevertheless, because the Court recommends granting leave to amend and seeks to promote the efficient adjudication of this matter, it shall provide the applicable law that appears to be implicated in the parties' arguments.  However, the parties are advised that, if the District Judge adopts the instant findings and recommendations and permits amendment, any further briefings presented to this Court shall include properly-supported arguments which reference the relevant legal authorities.

1      1.      Negligence

2          To state a cognizable claim for negligence under California law, a plaintiff "must establish

3  four required elements: (1) duty; (2) breach; (3) -causation; and (4) damages." See Ileto v. Glock,

4  Inc., 349 F.3d 1191, 1203 (9th Cir. 2003) (citations omitted).

5          In moving to dismiss Plaintiffs' negligence-based claims, CAPMC argues Plaintiffs have

6  not established causation with respect to CAPMC, nor do the alleged facts show CAPMC

7  breached any duty of care owed to Plaintiffs. (ECF No. 34 at 12–14.) In opposition, Plaintiffs do

8  not appear to directly dispute CAPMC's causation argument, but instead argue CAPMC had a

9  duty to use due care in protecting Calley based on their "special relationship," and it breached that

10  duty when it failed to protect Calley from being killed by Mr. Garay. (ECF No. 40 at 13.) The

11  Court addresses the parties' arguments with respect to the elements of duty and causation herein.

12      **a.      Duty**

13          The California Supreme Court has explained a legal duty is an expression of the sum total

14  of those considerations of policy that lead the law to conclude that a particular plaintiff is entitled

15  to protection. Parsons v. Crown Disposal Co., 15 Cal.4th 456, 472 (1997).

16          As a general rule, one has no duty to control the conduct of another, and no duty to warn

17  those who may be endangered by such conduct. Hoff v. Vacaville Unified Sch. Dist., 19 Cal. 4th

18  925, 933 (1998). However, a duty of care may arise through statute, contract, the general

19  character of the activity, or the relationship between the parties.[13] The Ratcliff Architects v.

20

21  _____

   [13] To this point, it is important to note the distinction between negligent "misfeasance" versus "nonfeasance." See
22  Romero v. Superior Ct., 89 Cal. App. 4th 1068, 1079–80, 1090–91 (2001) (explaining distinctions of misfeasance
   and nonfeasance under general negligence principles). As one California appellate court notes, misfeasance exists
23  when the defendant is responsible for making the plaintiff's position worse, i.e., the defendant, through his own
   action has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person. See
24  id. Where negligent misfeasance allegedly occurred, the question of duty is governed by the standards of ordinary
   care. See id. Nonfeasance, by contrast, refers to when the defendant has failed to aid the plaintiff through beneficial
25  intervention. See id. Thus, because of the general rule of "no duty to aid," negligent nonfeasance is usually limited
   to circumstances in which a special relationship exists. See id. Confusingly, Plaintiffs at times argue CAPMC put
26  them in a worse position by rendering aid because it angered Mr. Garay, heightening the risk of his physical violence
   against Plaintiffs and making it more imminent; this would implicate negligent misfeasance. However, they also
27  argue that CAPMC failed to protect them from Mr. Garay's violence by asserting a special relationship existed; this
   suggests Plaintiffs are proceeding on a general theory of liability based on negligent nonfeasance. The fact that it
28  remains unclear to this Court whether Plaintiffs are suing CAPMC for affirmative actions it took or for actions it
   failed to take lends further support to the Court's finding that the instant motion to dismiss should be granted, albeit
   with leave to amend.

1  Vanir Constr. Mgmt., Inc., 88 Cal. App. 4th 595, 604–05 (2001) (citation omitted).   In
2  determining whether a particular defendant owed a duty to a given plaintiff, courts generally
3  apply a policy-driven multifactor test (the Rowland factors).   These nonexclusive factors include:
4  (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered
5  harm; (3) the closeness of the connection between the defendant's conduct and the injury
6  suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing
7  future harm; (6) the extent of the burden to the defendant; (7) the consequences to the community
8  of imposing a duty to exercise care with resulting potential liability for breach of that duty; and
9  (8) the availability, cost, and prevalence of insurance for the risk involved.   See Romero, 89 Cal.
10  App. 4th at 1091 (citations omitted); Rowland v. Christian, 69 Cal.2d 108, 113 (1968).   The
11  parties do not expressly discuss the Rowland factors; however, their arguments touched upon
12  some of the factors.

13          (i)      Special Relationship/Undertaking

14          Plaintiffs argue CAPMC had a duty to use due care in protecting Calley from harm by Mr.
15  Garay, based on their "special relationship."   (ECF No. 40 at 13.)   A duty may arise where a
16  special relationship exists between the actor and the other which gives the other a right to
17  protection.   Hoff, 19 Cal. 4th at 933 (citations omitted); see also Romero, 89 Cal. App. 4th at
18  1079 ("where … a complaint alleges injuries resulting from the criminal acts of third persons …
19  the common law, reluctant to impose liability for nonfeasance, generally does not impose a duty
20  upon a defendant to control the conduct of another, or to warn of such conduct, unless the
21  defendant stands in some special relationship either to the person whose conduct needs to be
22  controlled, or to the foreseeable victim of such conduct.") (internal citations and quotations
23  omitted, emphasis in original).

24          "Whether a relationship is determined to be special for the purpose of imposing an
25  affirmative duty on one party to act on behalf of the welfare of another, will depend on a variety
26  of factors not yet fully defined and, to no small extent, on important policy considerations."
27  Romero, 89 Cal. App. 4th at 1080.   For example, in Romero v. Superior Court, the court noted
28  California courts have held that "an adult who invites a minor into his or her home assumes a

38

special relationship with that youngster based on the minor's vulnerability to third party misconduct and dependence on the adult for protection from risks of harm while in the home." Id. at 1080–81.  Though discussed within the context of § 1983 claims, the Ninth Circuit has also indicated a "special relationship" may exist "where the state has 'created or assumed a custodial relationship toward the plaintiff,' where it 'affirmatively placed the plaintiff in a position of danger,' where it 'was aware of a specific risk of harm to the plaintiff,' or where 'the state affirmatively committed itself to the protection of the plaintiff.' "  O'Brien v. Maui Cnty., 37 F. App'x 269, 271 (9th Cir. 2002) (no special relationship existed between police officers and domestic violence victim in § 1983 claim) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 700 (9th Cir. 1988) (affirmative duty to protect plaintiff from domestic violence "[does not arise merely] from the State's knowledge of plaintiff's predicament or from its expressions of intent to help him….")).

Though they do not expressly refer to it, the Court notes Plaintiffs' position regarding their purported special relationship with CAPMC appears to be grounded in the theory of "good Samaritan" or negligent undertaking liability.  Under the common law "good Samaritan" rule, "one who, having no initial duty to do so, undertakes to come to the aid of another—the 'good Samaritan'—has a duty to exercise due care in performance and is liable if (a) his failure to exercise care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."  Artiglio v. Corning Inc., 18 Cal.4th 604, 613 (1998) (citations and internal quotations omitted).  The California Supreme Court notes the traditional version of this theory of "negligent undertaking" liability, as articulated in the Restatement, requires a plaintiff to establish that:

> (1) The actor … undertook, gratuitously or for consideration, to render services to another …; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons (plaintiffs); (3) the actor failed to exercise reasonable care in the performance of its undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking.

1    Artiglio, 18 Cal. 4th at 613–14 (citations omitted).

2        Where a voluntary undertaking gives rise to a duty of care, the scope of such duty depends

3    upon the nature of the undertaking.  Elsheref v. Applied Materials, Inc., 223 Cal. App. 4th 451,

4    462 (2014) (citing Delgado v. Trax Bar & Grill, 36 Cal.4th 224, 249 (2005)); see also Rickley v.

5    Goodfriend, 212 Cal. App. 4th 1136, 1156 (2013) (Defendants who undertake an affirmative

6    course of conduct affecting the interests of another are regarded as assuming a duty to act and

7    must do so with care, as they will be held liable for negligent acts or omissions).   As the

8    California Supreme Court noted, "[t]he foundational requirement of the good Samaritan rule is

9    that in order for liability to be imposed upon the actor, he must specifically have undertaken to

10   perform the task that he is charged with having performed negligently, for without the actual

11   assumption of the undertaking there can be no correlative duty to perform that undertaking

12   carefully."  Artiglio, 18 Cal.4th at 614–15 (citation omitted).   Furthermore, the court stressed

13   "[t]he duty of a 'good Samaritan' is limited.  Once he has performed his voluntary act he is not

14   required to continue to render aid indefinitely."  Id. at 615 (internal quotations omitted) (citing

15   Baker v. City of L.A., 188 Cal. App. 3d 902, 907 (1986) (policeman who took gun from

16   intoxicated husband "did not become a guarantor of [wife's] future safety"); Andrews v. Wells,

17   204 Cal. App. 3d 533, 541 (1988) (bartender who twice arranged ride for intoxicated patron had

18   no continuing duty to make such arrangements); City of Santee v. Cnty. of S.D., 211 Cal. App. 3d

19   1006, 1012 (1989) (county sheriff's past reporting of traffic light outages gave rise to no

20   continuing duty to make such reports).)  Whether a defendant's alleged actions, if proven, would

21   constitute an "undertaking" sufficient to impose a duty of care is a legal question for the court.

22   Id.

23        As noted, however, Plaintiffs cite no legal authority to support their contention that a

24   special relationship exists between the provider and recipient of domestic violence victim

25   services.  The one sentence in their opposition that CAPMC "had a special relationship with

26   Plaintiffs" is conclusory.  Plaintiffs do not point to any allegations in the FAC which sufficiently

27   describe their interactions with CAPMC employees so as to demonstrate the existence of a special

28   relationship.  Nor did they provide substantive or policy-based reasons for the Court to recognize

1    the existence of a special relationship at the hearing on the motions.

2            Considering the Ninth Circuit and California Supreme Court's discussion of "special

3    relationship" and negligent undertaking liability, the Court finds much of the analysis provided on

4    Plaintiffs' due process (state-created danger) claim is applicable here.  Within the context of

5    CAPMC as provider of victim services to Plaintiffs, Plaintiffs were permitted to stay at a

6    domestic violence shelter, but CAPMC did not assume custody of Plaintiff; they were free to

7    come and go as they pleased.  See Murguia, 61 F.4th at 1109.  For the same reasons discussed

8    with respect to Plaintiffs' state-created danger claim, the Court does not find CAPMC placed

9    Plaintiffs in a state of danger, but rather, provided a safe space for Plaintiffs to escape the

10   dangerous environment of their home with Mr. Garay.

11           As to whether CAPMC "affirmatively committed itself to the protection of the plaintiff,"

12   it is undisputed that CAPMC provided services such as lodging at its domestic violence shelter,

13   assistance with at least one court proceeding, and transportation on July 14, 2020; however, it is

14   unclear from the FAC that CAPMC specifically undertook the task of protecting Calley and the

15   children from any and all harm by Mr. Garay.  See Artiglio, 18 Cal.4th at 614–15.  In fact,

16   CAPMC argues a distinction exists between taking reasonable measures to protect against known

17   risks and undertaking "any/all actions to **_guarantee_** the safety of [Calley] and her children from

18   criminal misconduct of third parties."  (ECF No. 41 at 6 (emphasis in original).)  This argument is

19   well-taken.  Plaintiffs have alleged no facts showing the heightened level of duty they seem to

20   suggest was warranted.  Indeed, their contention that CAPMC was responsible for protecting

21   them from Mr. Garay's abuse at all times appears to conflict with California authority on the good

22   Samaritan rule.  See, e.g., Artiglio, 18 Cal.4th at 614–15; Baker, 188 Cal. App. 3d at 907.  Nor do

23   Plaintiffs point to allegations in the FAC defining the scope of any duty assumed by CAPMC in

24   their oppositional papers.  Thus, it is not apparent from the face of the pleading that CAPMC

25   made such a commitment.  At most, Plaintiffs allege in the introduction of the FAC that

26   "Defendants … affirmatively led [Calley] to believe that they would keep her and her children

27   safe …."  (FAC ¶ 8.)  This general allegation, which does not distinguish between the different

28   named Defendants in this action, however, is too generalized and conclusory to establish CAPMC

41

1   undertook the specific task of protecting Plaintiffs indefinitely from Mr. Garay's abusive actions.

2   On this record, the Court cannot conclude Plaintiffs have established a special relationship or

3   negligent undertaking in the FAC.

4           (ii)    Foreseeability

5           A critical part of the duty of care inquiry is whether the plaintiff is "foreseeably

6   endangered by defendant's conduct." Jacoves v. United Merchandising Corp., 11 Cal. Rptr. 2d at

7   484 (1992).  The California Supreme Court has explained that "one's general duty to exercise due

8   care includes the duty not to place another person in a situation in which the other person is

9   exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including

10  the reasonably foreseeable negligent conduct) of a third person." Lugtu v. Cal. Highway

11  Patrol, 26 Cal.4th 703, 110 (2001).

12          Elaborating on the foreseeability inquiry, the Ninth Circuit explained:

13                  The foreseeability of a particular kind of harm plays a very
                    significant role in this calculus, but a court's task—in determining
14                  duty—is not to decide whether a particular plaintiff's injury was
                    reasonably foreseeable in light of a particular defendant's conduct,
15                  but rather to evaluate more generally whether the category of
                    negligent conduct at issue is sufficiently likely to result in the kind
16                  of harm experienced that liability may appropriately be imposed on
                    the negligent party.   The jury, by contrast, considers
17                  "foreseeability" in two more focused, fact-specific settings.  First,
                    the jury may consider the likelihood or foreseeability of injury in
18                  determining whether, in fact, the particular defendant's conduct was
                    negligent in the first place.  Second, foreseeability may be relevant
19                  to the jury's determination of whether the defendant's negligence
                    was a proximate or legal cause of the plaintiff's injury.
20

21  Ileto, 349 F.3d at 1204 (citing Ballard, 224 Cal. Rptr. 664, 572 n. 6 (1986)).

22          CAPMC argues the risk that Camarena Health would disclose the details of Calley's

23  medical appointment to Mr. Garay, enabling him to track her down and kill her, was

24  unforeseeable.  (See ECF No. 41 at 6–7.)  In support of this argument, CAPMC argues the FAC

25  contains no facts to show it had notice of Camarena Health's disclosure of Calley's private

26  medical information to Mr. Garay, or that Mr. Garay otherwise posed an imminent risk to Calley,

27  as she was staying at a shelter of undisclosed location.

28          In opposition, Plaintiffs argue it was foreseeable that Mr. Garay would attempt to harm

1   Calley and the children because he's an abuser, that the risk of danger he presented to Calley and

2   the children was heightened after CAPMC provided victim services to them, and this heightened

3   risk was foreseeable because it is well-known by providers of domestic violence services that

4   domestic abusers pose a grave risk to the health and safety of their family-member victims, which

5   becomes more acute, immediate, and imminent when abuse victims leave their abusers.   (See

6   FAC ¶¶ 50, 51.)   In light of this information, Plaintiffs argue it was reasonably foreseeable that,

7   after CAPMC provided victim services to Plaintiffs, thus enabling Calley and the children to

8   leave the abusive home, there was a heightened risk that Mr. Garay would ultimately find and

9   harm Calley.

10        As the Court noted at the hearing, certainly, it is reasonably foreseeable that abusers will

11   pose a threat of harm to their family members/abuse victims.   However, the general risk of harm

12   identified by Plaintiffs is too vague and broad to meet the foreseeability requirement here.   As

13   noted, the Court must evaluate whether the category of purported negligent conduct at issue is

14   sufficiently likely to result in the kind of harm experienced.   Here, the category of alleged

15   negligent conduct appears to be driving a domestic violence victim (who has cut ties and no

16   longer resides with her abuser) on a personal errand without armed security.   The Court cannot

17   say it appears sufficiently likely that this action would result in the kind of harm experienced—

18   *i.e.*, the abuser knowing the exact timing and location of the victim's errand, appearing there, and

19   harming her.   It is further unknown to the Court at this time whether the addition of other facts

20   would cure this defect, but it finds the current FAC does not allege sufficient facts to establish the

21   foreseeability element with respect to Plaintiffs' claims as asserted against Defendant CAPMC.

22        (iii)   Policy Considerations

23        The Rowland factors include policy considerations, such as the policy of preventing future

24   harm and the potential consequences to the community of imposing a duty.   Rowland, 69 Cal.2d

25   at 113.   While the parties did not brief policy considerations, the issue was raised at the hearing

26   on the motion, as California courts have repeatedly stressed the important role policy

27   considerations play in the determination of whether to impose a duty of care.   See, e.g., Parsons,

28   15 Cal.4th at 472; Romero, 89 Cal. App. 4th at 1080.   CAPMC argued, and the Court agrees,

1   there is always a foreseeable risk of violence to domestic violence victims.  However, finding that

2   a duty to protect is undertaken every time that services are provided to such victims—such as

3   assistance in obtaining a restraining order, and providing shelter at an undisclosed location, and

4   financial and other resources—would have the practical effect of creating a heightened duty for

5   those providers beyond the mere general duty of care associated with provision of those particular

6   services.  From a policy standpoint, the resulting exposure to liability based on a finding of duty

7   here might have a significant chilling effect on agencies that would otherwise provide victim

8   services to assist victims of domestic violence.  Plaintiffs presented no substantive rebuttal

9   argument on this point.  The Court therefore finds policy considerations weigh against imposing a

10   duty.

11         **b.**    **Causation**

12        As noted, CAPMC moves to dismiss the negligence-based claims because Plaintiffs have

13   not sufficiently alleged proximate cause.  Specifically, CAPMC argues the FAC alleges no facts

14   showing how driving Calley to her medical appointment caused her death; rather, it was the leak

15   of personal information to Mr. Garay by Camarena Health, and Mr. Garay's own subsequent

16   actions.  Plaintiffs presented general causation arguments with respect to the heightened risk of

17   Mr. Garay lashing out against Calley after CAPMC provided services, including assisting Calley

18   and the children in leaving the home; however, the Court finds this argument does not speak to

19   the issue of proximate cause.  Here, the proximate cause of Calley's death was Mr. Garay, who

20   waited in the parking lot of the clinic for Calley to finish her medical appointment and shot her

21   after she was seen exiting the clinic.  Relatedly, the reason Mr. Garay was able to find Calley was

22   because Camarena Health disclosed to him the exact time, place, and location of Calley's

23   appointment.  Importantly, Plaintiffs do not allege any facts showing any connection between

24   CAPMC and Camarena Health, or that CAPMC disclosed Calley's personal information at any

25   time to Mr. Garay or otherwise enabled him to find her.  Nor do Plaintiffs allege that CAPMC

26   was aware Camarena Health had disclosed the date, time, and location of Calley's medical

27   appointment to Mr. Garay.  Thus, the FAC fails to allege facts sufficient to establish proximate

28   cause.  Accordingly, the Court finds Plaintiffs fail to allege sufficient facts to state a claim for

negligence against CAPMC.

2.    Negligent Infliction of Emotional Distress (NIED)

"Where there is a claim for the 'negligent infliction of emotional distress,' the plaintiff must be either a 'direct victim' of the wrongful conduct, or, with certain qualifications, a bystander[] (*i.e.*, 'percipient witness to the injury of another')."  Smith v. Pust, 19 Cal. App. 4th 263, 273 (1993) (citations omitted).  A "direct victim" claim arises only in three scenarios: (1) mishandling of corpses, (2) misdiagnosis of a disease, and (3) breach of a duty from a preexisting relationship.  (Christensen v. Superior Ct., 54 Cal. 3d 868, 879 (1991); Molien v. Kaiser Found. Hosps., 27 Cal. 3d 916, 923 (1980); Burgess v. Superior Ct., 2 Cal. 4th 1064, 1076 (1992)).)  A bystander claim requires that the bystander: "(1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances."  Thing v. La Chusa, 48 Cal. 3d 644, 667–68 (1989).

Plaintiffs appear to be proceeding under a bystander theory.  Plaintiffs allege J.G.1, J.G.2 and J.G.3 were immediately present and contemporaneously aware their mother was being injured at the time of the event, and they suffered great emotional distress as a result of witnessing Calley's death.  (FAC ¶¶ 155, 157.)  This would be sufficient to satisfy the elements specific to a bystander NIED claim.  However, the claim still fails because, for the reasons previously discussed, Plaintiffs have not alleged sufficient facts to establish the other elements required in every negligence-based claim, *i.e.*, duty, breach, and causation.

Accordingly, Plaintiffs fail to allege sufficient facts to state a claim for negligent infliction of emotional distress against Defendant CAPMC.

3.    Negligent Training and Supervision

Under California law, an employer may be held directly liable for the behavior of an unfit employee where the employer was negligent in the hiring, training, supervising, or retaining of that employee.  Delfino v. Agilent Techs., Inc., 145 Cal. App. 4th 790, 815 (2006).  For example, a plaintiff alleging negligent training under California law must show that the employer

1  negligently trained the employee as to the performance of the employee's job duties and as a

2  result of such negligent instruction, the employee while carrying out his job duties caused injury

3  or damage to the plaintiff.  See State Farm Fire & Casualty Co. v. Keenan, 171 Cal. App. 3d 1, 23

4  (1985).  California follows the rule set forth in the Restatement (Second) of Agency Section 213,

5  which provides in pertinent part: "A person conducting an activity through servants or other

6  agents is subject to liability for harm resulting from his conduct if he is negligent or reckless ... in

7  the employment of improper persons or instrumentalities in work involving risk of harm to

8  others."  Liability may be imposed "either on the basis of ... action—for example, the negligent

9  hiring of an agent—or ... inaction—for example, the failure to provide adequate supervision of

10  the agent's work."  Far West Financial Corp. v. D & S Co., 46 Cal.3d 796, 812 (1988).

11        However, negligence liability will only be imposed upon the employer if it knew or

12  should have known that hiring the employee created a particular risk or hazard and that particular

13  harm then materializes.  Delfino, 145 Cal. App. 4th at 815; see also Juarez v. Boy Scouts of

14  Am., 81 Cal. App. 4th 377, 395 (2000) (quoting Noble v. Sears, Roebuck & Co., 33 Cal. App. 3d

15  654, 664 (1973)) ("there can be no liability for negligent supervision in the absence of knowledge

16  by the principal that the agent or servant was a person who could not be trusted to act properly

17  without being supervised.").  Thus, to state a cause of action for negligent training or supervision,

18  a plaintiff must allege facts to show that the defendant was on notice that the employee was likely

19  to cause harm before the harm occurs.  See Phillips v. TLC Plumbing, Inc., 172 Cal. App. 4th

20  1133, 1139–40 (2009).

21        First, Plaintiffs' fifth cause of action is pleaded in a conclusory fashion, mostly reciting

22  boilerplate elements of the claim.  (See, e.g., FAC ¶ 159 ("Defendants CAPMC, County of

23  Madera, and Camarena Health had a duty to use reasonable care in the training and supervision of

24  its employees and agents."); see also id. at ¶ 160 (stating Defendants had a duty to train and

25  supervise employees "to keep [Calley] and people like her safe from foreseeable harm").)

26  Further, the facts alleged do not appear to apply to CAPMC.  For example, Plaintiffs allege all

27  three Defendants had a duty to train and supervise their agents and employees "to avoid

28  disclosing the whereabouts of people like [Calley] to abusive spouses, to avoid disclosing private

46

1   information including healthcare information, ….” (id. at ¶ 160), but this allegation does not

2   apply to CAPMC because Plaintiffs do not any employee of CAPMC disclosed Calley's

3   information to Mr. Garay.

4        Second, Plaintiffs do not allege particularized facts identifying the purportedly negligent

5   behavior of a CAPMC employee that caused the harm (here, Calley's death), nor do Plaintiffs

6   show CAPMC had prior knowledge of any problematic behavior of an employee.  At most,

7   Plaintiffs allege Ms. Rodriguez was fired for "incompetency" and "dishonesty" after Calley's

8   death.  This alone, however, does not establish CAPMC had knowledge prior to the incident.

9   <u>Juarez</u>, 81 Cal. App. 4th at 395.  Plaintiffs' alleged belief that Ms. Rodriguez's incompetent and

10   dishonest actions predated Calley's case, therefore imputing actual or constructive notice to

11   CAPMC, is conclusory.  Further, Plaintiffs do not identify what particular problematic behavior

12   or actions by Ms. Rodriguez resulted in the specific harm of Calley's death.  <u>Delfino</u>, 145 Cal.

13   App. 4th at 815.  As for the unidentified driver of the vehicle that transported Calley and the

14   children to Calley's medical appointment on July 14, 2020, the FAC similarly fails to identify the

15   problematic behavior of that employee or allege facts establishing CAPMC had prior knowledge

16   of such behavior.

17        Finally, for the same reasons previously discussed, the FAC does not contain facts which

18   satisfy the general elements of this negligence-based cause of action (duty, breach, and

19   causation).  Accordingly, Plaintiffs fail to allege sufficient facts to state a cause of action for

20   negligent training and supervision against Defendant CAPMC.

21       **C.**    **Conclusion**

22        For the foregoing reasons, the Court recommends Defendant CAPMC's motion to dismiss

23   be partially granted, in that Plaintiffs be granted leave to amend their claims against CAPMC, to

24   the extent they can identify any wrongful conduct specific to CAPMC that is directly related to

25   Calley's death on July 14, 2020, and allege facts sufficient to cure the other aforementioned

26   pleading defects.

27   ///

28   ///

# VI.

## COUNTY'S MOTION TO DISMISS (ECF NO. 42)

Plaintiffs assert the same claims against County as they did against CAPMC, that is: federal causes of action for state-created danger (claim 1) and interference with parent/child relationship in violation of the Fourteenth Amendment (claim 2), as well as state law causes of action for negligence (claim 3), negligent infliction of emotional distress (claim 4), and negligent training and supervision (claim 5). (FAC at 3, 15–20.)

### A.    Parties' Arguments

County's motion is premised on the argument that it had no role whatsoever in the events leading to Calley's death: namely, it did not supervise or handle Calley's visit to Camarena Health on the day of the shooting; it was not present and did not witness the shooting; it did not own or lease the clinic property; it did not supply the weapon Mr. Garay used; it did not own or operate the shelter at which Calley and the children stayed; it did not provide information of Calley's medical appointment to Mr. Garay; and was not involved in any way on the date of her death. (ECF No. 42-1 at 5.)  County further argues the negligence-based claims are boilerplate and fail to allege duty and failure to train or supervise on issues relating to protection and safety of abused spouses with respect to County. (Id. at 5–6.)  County also challenges Plaintiffs' "conclusory" allegations that County had a deficient policy that contributed to the incident, and argues Plaintiffs do not allege facts showing County acted or failed to act, or otherwise contributed to the incident; rather, Plaintiffs appear to allege the occurrence of only a single incident. (Id. at 6, 12–19.)  In addition, County raises a Rule 8(a) challenge to the pleadings, on the basis that the FAC fails to differentiate among the Camarena Defendants, CAPMC, and County. (ECF No. 42-1 at 12.)  Finally, County requests the Court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. (Id. at 19.)  Alternatively, County argues the negligence-based claims fail because Plaintiffs do not allege facts showing non-respondeat superior liability by County (i.e., that County violated any law), or proximate causation; County also argues the negligent supervision claim is duplicative of the general negligence claim and should also be dismissed. (Id. at 19–21.)

48

1    In opposition, Plaintiffs point to allegations in the FAC that they contend adequately

2    establish County's role in Calley's death and <u>Monell</u> liability, consistent Rule 8(a)(2).  (ECF No.

3    45 at 2–8.)  Plaintiffs argue the recent Ninth Circuit case <u>Murguia v. Langdon</u> supports their

4    <u>Monell</u> claim under the theory of state-created liability.  (<u>Id.</u> at 8–10.)  Further, Plaintiffs argue

5    the FAC adequately asserts a <u>Monell</u> claim under the failure to train/supervise theory.  (<u>Id.</u> at 10–

6    11.)  As to their state negligence claims, Plaintiffs oppose dismissal of the claims solely on the

7    basis of purported redundancy.  (<u>Id.</u> at 11–12.)  Further, they argue their allegations regarding the

8    incompetency of Ms. Rodriguez is sufficient support of the negligent training and supervision

9    claim.    (<u>Id.</u> at 12–13.)    Finally, in the alternative, Plaintiffs seek leave to amend any

10    insufficiently-pleaded claims (<u>id.</u> at 13), which County opposes (ECF No. 46 at 14).

11    **B.    Discussion**

12    1.    <u>Federal Rule of Civil Procedure 8</u>

13    As noted, Rule 8(a) requires that a pleading contain "a short and plain statement of the

14    claim showing that the pleader is entitled to relief."  <u>See Iqbal</u>, 556 U.S. 662, 678–79 (2009).

15    Under notice pleading in federal court, the complaint must "give the defendant fair notice of what

16    the claim … is and the grounds upon which it rests."  <u>Twombly</u>, 550 U.S. 544, 555 (2007)

17    (internal quotations omitted).  Thus, to comply with Rule 8, a complaint should clearly and fully

18    set forth "who is being sued, for what relief, and on what theory, with enough detail to guide

19    discovery."  <u>Id.</u> at 1178.  Further, "each claim founded on a separate transaction or occurrence …

20    must be stated in a separate count."  Fed. R. Civ. P. 10(b); <u>see also</u> <u>Hendrix v. Health & Soc.</u>

21    <u>Servs. of Solano Cnty.</u>, No. 2:15-cv-02689-MCE-EFB PS, 2017 WL 4004168, at *5 (E.D. Cal.

22    Sept. 12, 2017) (requiring "clear headings to delineate each claim alleged and against which

23    defendant"), <u>report and recommendation adopted</u>, 2017 WL 4340166 (E.D. Cal. Sept. 29, 2017).

24    A complaint runs afoul of Rule 8 when "one party pleads that multiple parties did an act,

25    without identifying which party did what specifically; or when one party pleads multiple claims,

26    and does not identify which specific facts are allocated to which claim."  <u>See</u> <u>Hughey v.</u>

27    <u>Camacho</u>, No. 13-2665, 2014 WL 5473184, at *4 (E.D. Cal. Oct. 23, 2014); <u>see also</u> <u>Harrell v.</u>

28    <u>Hornbrook Cmty. Serv. Dist.</u>, No. 2:14-cv-01595-KJM-GGH, 2015 WL 5329779, at *10 (E.D.

1    Cal. Sept. 10, 2015).  Thus, if the factual elements of a cause of action are present but are

2    scattered throughout the complaint and not organized into a "short and plain statement of the

3    claim," dismissal for failure to satisfy Rule 8 is proper.  McHenry, 84 F.3d at 1178.  Further,

4    "[t]he propriety of dismissal for failure to comply with Rule 8 does not depend on whether the

5    complaint is wholly without merit."  Id. at 1179.  Indeed, Rule 8(d)'s requirement that each

6    averment of a pleading be "'simple, concise, and direct,' applies to good claims as well as bad,

7    and is a basis for dismissal independent of Rule 12(b)(6)."  Id.

8         County argues the causes of action fail to differentiate between which Defendant is being

9    sued for what purported actions.  (See, e.g., FAC ¶¶ 122–27, 148–52.)  The Court agrees. The

10   FAC often fails to distinguish between the Defendants; in particular, the FAC often combines

11   County and CAPMC into a single paragraph, or asserts separate but identical paragraphs for each

12   of the two Defendants.  Thus, it is often unclear what actions Plaintiffs are attributing to County

13   as opposed to CAPMC because it alleges in identical paragraphs that these two Defendants did

14   the exact same thing.  For example, the FAC alleges both County and CAPMC drove Calley to

15   her medical appointment.  (See id. at ¶¶ 105, 106.)  Given these internal inconsistencies and

16   failure to allege their claims with the requisite specificity, it is sometimes unclear to the Court

17   which actions Plaintiffs are attributing to each of the four named Defendants.  Because the Court

18   is recommending Defendants' motions to dismiss be granted with leave to amend, Plaintiffs are

19   advised that, if these recommendations are adopted, the second amended complaint should seek to

20   address and correct this defect in the pleadings.  Nevertheless, the Court does not recommend

21   dismissal *solely* on the basis of a Rule 8 violation, as the Court can logically ascertain which

22   causes of action Plaintiffs have asserted against each Defendant, based on the underlying facts

23   alleged in the FAC.

24        2.    County's Role in Events Leading to Calley's Death

25        Relatedly, the Court addresses County's argument that it should be dismissed because

26   Plaintiffs do not allege any facts showing County played any role whatsoever in the events

27   leading to Calley's death.  This argument is well-taken.

28        As noted, to state a claim under § 1983, a plaintiff is required to show that each defendant

50

acted under color of state law and deprived her of federal or constitutional rights.  Benavidez v. Cnty. of S.D., 993 F.3d 1134, 1144 (9th Cir. 2021) (citations omitted).  This requires the plaintiff to demonstrate that each defendant personally participated in the deprivation of her rights.  Jones v. Williams, 297 F.3d 930, 934–35 (9th Cir. 2002); see also Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)) (a deprivation occurs if the defendant "does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do").  In other words, to state a claim for relief under § 1983, Plaintiffs must link each named Defendant with some affirmative act or omission that demonstrates a violation of their federal rights.  While governmental entities are considered "persons" within the meaning of § 1983, Monell, 436 U.S. at 690–91, the linking requirement applies to them in the same manner as individual persons.  Thus, even though CAPMC and County are both state actors for purposes of the instant motion, Plaintiffs must still allege facts showing each entity's personal participation in the at-issue deprivation.  See Jones, 297 F.3d at 934–35.

Here, Plaintiffs do not allege any non-conclusory facts against County with respect to the July 14, 2020 incident, or any other actions concerning Calley and the children.[14]  That is, Plaintiffs allege no facts that any County employee was involved in the provision of victim services to Calley and the children, or specifically the transportation services provided to Calley and the children on July 14, 2020, and no facts that any County employee had any interactions with Calley and the children or Mr. Garay at any time.  Instead, Plaintiffs allege Calley and the children were staying at a CAPMC-run shelter (see FAC ¶¶ 90, 91, 126), and that Ms. Rodriguez, a CAPMC employee, assisted Calley at her July 2020 court proceeding against Mr. Garay (id. at

---

[14] The Court notes Plaintiffs do allege facts against County, such as "[t]he County of Madera encouraged and aided and abetted Ms. Garay in leaving her husband and in taking the children with her," "[t]he County of Madera knew that Calley Jean Garay would receive healthcare from Camarena Health while she was living at a CAPMC facility," and "CAPMC and the County of Madera failed to adequately train and supervise [CAPMC employee] Ms. Rodriguez, and wrongly hired and retained her, despite knowing of her unfitness for employment and the risk that it posed to abuse victims like Ms. Garay."  (FAC ¶¶ 61, 90, 102.)  These are "conclusions cast in the form of factual allegations."  Chunie, 788 F.2d at 643 n.2.  As such, the Court need not assume the truth of such conclusions.  Id.

51

1   ¶¶ 75, 134).[15]   However, while noted in the state actor discussion of CAPMC's motion that

2   Plaintiffs have alleged certain ties between CAPMC and County—such as the facts that

3   CAPMC's Executive Director is an official and employee of the County, and County "maintains

4   an oversight role with [CAPMC]" and "has executed contracts with [CAPMC] to provide various

5   services to the community" (see id. at ¶¶ 27, 29, 30–34)—Plaintiffs have not alleged facts

6   showing that CAPMC and County are actually the same entity, i.e., that CAPMC is a subdivision

7   of the County.  Accordingly, the FAC does not satisfy the linking requirement under § 1983 as to

8   Defendant County.  Benavidez, 993 F.3d at 1144; Jones, 297 F.3d at 934–35; see also Ewing, 588

9   F.3d at 1235.  Dismissal on this basis is, therefore, warranted.

10      Notwithstanding the aforementioned pleading defects with respect to Plaintiffs' claims

11  against County, and even assuming Plaintiffs had sufficiently established CAPMC and County

12  were the same entity or otherwise working in concert on July 14, 2020, a substantive evaluation

13  of Plaintiffs' claims against County warrants granting County's motion to dismiss, as follows.

14      3.   Monell Claims[16]

15      Here, County challenges Plaintiffs' Monell claims on the basis that no policy is identified

16  and the FAC only depicts a single incident, rather than the pattern or practice of violations

17  required to establish Monell liability.

18      **a.   Policy**

19      First, County argues Plaintiffs do not allege any existing policy; therefore, the two Monell

20  claims asserted against it fail.  (ECF No. 42-1 at 13–15.)  The Court agrees.  As with Plaintiffs'

21  allegations against CAPMC, Plaintiffs' near identical allegations against County are equally

22  conclusory and fail to actually describe any County policy or procedure that caused the harm

23  alleged in the FAC.  Further, as previously discussed, the FAC contains no allegations suggesting

---

25  [15] Plaintiffs also allege, in identical paragraphs that County and CAPMC both "assisted in transporting Ms. Garay to
    her medical appointment at Camarena Health on or about July 14, 2020."  (Id. at ¶¶ 105, 106.)  However, no
26  individual employee is identified, because of the duplicate allegations, it is unclear from the FAC which entity was
    involved in Calley's transportation on July 14, 2020 (though it was suggested at the hearing that this was a CAPMC
27  employee), and the FAC does not allege any further involvement by either entity with respect to the July 14 incident.

28  [16] The same legal standard for Monell claims provided in the Court's discussion of CAPMC's motion is applicable
    here and thereby incorporated by reference.

1  Plaintiffs' case amounts to anything more than a "single occurrence of unconstitutional action by
2  a non-policymaking employee." McDade, 223 F.3d at 1141; Long, 442 F.3d at 1186.

3         County additionally argues Plaintiffs' contention that there was an absence of policy does
4  not comport with the legal standard for a Monell claim, which always requires identification of a
5  policy.  Construing all favorable inferences in the FAC, the allegations of no policy appear to be
6  asserted in support of Plaintiffs' alternative theory for Monell liability, the failure to train.

7         **b.     Failure to Train**

8         County argues, and the Court agrees, Plaintiffs do not allege facts that any County
9  employee (or agent) caused Plaintiffs' purported constitutional deprivation, let alone tie such
10  deprivation to any training deficiencies utilized or implemented by County.  As a result of these
11  pleading deficiencies, and for the same reasons previously discussed by this Court with respect to
12  CAPMC's motion, Plaintiffs' Monell claim based on failure to train also fails.

13         **c.     Moving Force**

14         As noted, Plaintiffs attribute the same actions of CAPMC to County in the FAC.  Namely,
15  Plaintiffs allege that County (like CAPMC) transported Calley "in an easily-identifiable vehicle
16  staffed with one unarmed female employee who had been employed for only approximately 6
17  months" to her medical appointment and subsequently failed to protect her from a surprise attack
18  by Mr. Garay.  (Compare FAC ¶ 107 with id. at ¶ 108.)  However, as previously noted, the FAC
19  fails to satisfy § 1983's linking requirement where it is unclear to which defendant Plaintiffs
20  attribute each action, see Jones, 297 F.3d at 934–35, and Plaintiffs have not alleged CAPMC was
21  acting as an agent or subdepartment of County, or established any other connection between
22  County and CAPMC so as to attribute the actions of CAPMC's employees to County.
23  Furthermore, for the same reasons for which it was previously determined that Plaintiffs failed to
24  establish CAPMC's provision of transportation services was the moving force behind any alleged
25  constitutional violation, Plaintiffs also fail to establish County's alleged action (if any), based on
26  any purported "policy" relating to transportation services, was the cause of Calley's death.
27  Consequently, both Monell claims against County must fail.

28  ///

53

1

> ### d.    State-Created Danger

2  Finally, the Court notes that County, like CAPMC, argues the act of driving Calley to her

3  medical appointment (assuming this action is tied to County as well as CAPMC) does not

4  constitute a "state-created danger."   The Court again agrees, for the exact same reasons

5  previously discussed at length with respect to CAPMC's motion.

6  Plaintiffs' reliance on Murguia v. Langdon is unavailing.  As noted above, Plaintiffs do

7  not appear to accurately represent the holdings in Murguia.  Notably, the legal rule articulated by

8  the Ninth Circuit in Murguia is that liability based on a state-created danger is an extremely

9  limited exception to the general rule that the failure to act to protect an individual from private

10  violations does not deprive that individual of substantive due process under the Fourteenth

11  Amendment.  Murguia, 61 F.4th at 1108.  As the Ninth Circuit noted, the state-created danger

12  exception arose from the Supreme Court case DeShaney, in which the high court determined

13  social workers and local officers were not liable under a failure-to-act theory for injuries

14  sustained by a child by his abusive father, because the defendant state actors did not create or

15  enhance the danger (abusive father) by failing to permanently remove the child from the father's

16  custody.  Murguia, 61 F.4th at 1110 (citing DeShaney, 489 U.S. at 191, 201).

17  Furthermore, Murguia is factually inapposite to the instant claims as alleged against

18  County.  With respect to the reversed dismissals Plaintiffs identify, the Ninth Circuit found one

19  defendant police officer enhanced a danger by removing minor children from an abusive father,

20  only to leave them alone in a dangerous situation with their mentally unstable mother.  Murguia,

21  61 F.4th at 1113–14.  Thus, the officer merely placed the children in a worse situation than they

22  were previously in.  Here, by contrast, CAPMC/County removed Plaintiffs from the dangerous

23  home situation with Mr. Garay, and placed them in the safe environment of the shelter.  The other

24  reversal in Murguia relates to a defendant who provided misinformation to an officer that

25  ultimately led to the victims being placed in a dangerous situation.  See id. at 1115–16.  Again,

26  that situation is factually inapposite to the instant situation because it was not CAPMC/County

27  that called Mr. Garay and gave him Calley's location, enabling him to locate and attack her, but

28  Camarena Health.

In sum, for the reasons already extensively discussed regarding CAPMC's motion, Plaintiffs do not allege facts sufficient to establish the elements of a state-created danger claim; namely, neither CAPMC nor County created the danger that caused Calley's death (Mr. Garay), and neither Camarena's disclosure of information to Mr. Garay, nor Mr. Garay's ambushing and killing Calley on July 14, 2020, were foreseeable events to CAPMC or County.  Thus, as the Court has noted, Plaintiffs fail to establish any constitutional deprivation.

For the aforementioned reasons, as well as the additional reasons identified in the findings and recommendations regarding CAPMC's motion, Plaintiffs' <u>Monell</u> claims fail as asserted against County.

4.      <u>Negligence-Based Claims</u>[17]

County first argues Plaintiffs' negligence claim should be dismissed because Plaintiffs do not establish negligence *per se*.  The Court finds this argument unavailing.  Plaintiffs did not assert a negligence *per se* claim, but a claim of general negligence; County's argument in this regard applies the wrong legal standard.  Nevertheless, to the extent County argues Plaintiffs' negligence claim fails because Plaintiffs fail to allege sufficient proximate causation with respect to County, the Court agrees, for the same reasons previously discussed with respect to Plaintiffs' negligence claim asserted against CAPMC.

Next, County argues Plaintiffs' NIED and negligent training and supervision should be dismissed as superfluous to their negligence claim.  The Court disagrees.  Certainly, the legal standards for NIED and negligence training and supervision, are rooted in negligence and therefore requiring a showing of the same basic elements of negligence.  However, the Court does not find Plaintiffs' alternative theories of liability need be dismissed at the pleading stage as superfluous.  Nor do the cases cited by County support dismissal.  County's motion should be denied on this basis.

---

[17] The Court notes that, in addition to its substantive arguments that Plaintiffs' fail to state any negligence-based claim, County argues the Court should decline to exercise supplemental jurisdiction.  (ECF No. 42-1 at 19.)  In light of its recommendation to grant leave to amend the federal claims, however, the Court declines to make such a recommendation at this juncture.  Nevertheless, if Plaintiffs are granted leave to amend but the second amended complaint continues to assert deficient <u>Monell</u> claims against both CAPMC and County, the Court will be inclined to recommend that supplemental jurisdiction be declined at that time.

Finally, County argues Plaintiffs' negligence-based claims fail as asserted against it because Plaintiffs have not alleged sufficient facts establishing foreseeability.  (See ECF No. 42-1 at 20–21.)  The Court has addressed the foreseeability factor with respect to the CAPMC motion and finds Plaintiffs' claim as asserted against County fails to satisfy this element for the exact same reasons identified with respect to their claims asserted against CAPMC.

In sum, Plaintiffs have not alleged sufficient facts to establish the basic elements required in every negligence-based claim, *i.e.*, duty, breach, and causation in their claims against County.

**C.  Conclusion**

Plaintiffs' claims against County are deficient for the same reasons articulated by the Court with respect to their claims as asserted against CAPMC.  Therefore, County's motion should be granted.

## VII.

## LEAVE TO AMEND

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," because "the court must remain guided by the underlying purpose of Rule 15 … to facilitate decisions on the merits, rather than on the pleadings or technicalities." Lopez, 203 F.3d at 1127 (alterations and internal quotation marks omitted). Nevertheless, a district court need not grant leave to amend where the amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith.  Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court." Id.

As to the claims for which the Court recommends leave to amend be granted, the Court cannot say at this juncture that any factual amendment would be futile.  Lopez, 203 F.3d at 1130. Furthermore, while County argues leave to amend should be denied because Plaintiffs amended their complaint multiple times in their Northern District of California case, the Court notes the order granting dismissal in that matter was based on venue, without prejudice to filing the action in the Eastern District of California, and the Northern District court declined to address the merits

56

1    of the pleadings themselves.  Meanwhile, this Court's findings with respect to the instant motions

2    to dismiss constitute the first time this Court has evaluated the sufficiency of the pleadings and

3    the parties' arguments and identified the deficiencies in Plaintiffs' pleadings to them.  For these

4    reasons, the Court recommends Plaintiffs be granted leave to amend the claims against certain

5    Defendants, as identified in this order.

**VIII.**

**CONCLUSION AND RECOMMENDATIONS**

8    Based on the foregoing, IT IS HEREBY RECOMMENDED that:

9    1.    Defendants Camarena Health and Camarena Health Foundation's motion to

10          dismiss (ECF No. 29) be partially granted as follows:

11          a.    Plaintiffs' claims for punitive damages, attorneys' fees, and statutory

12                penalties be dismissed as asserted against Defendants Camarena Health and

13                Camarena Health Foundation; and

14          b.    Plaintiffs' claims against Camarena Health Foundation be dismissed with

15                leave to amend, as consistent with this order;

16    2.    Defendant Community Action Partnership of Madera County, Inc.'s motion to

17          dismiss (ECF No. 34) be GRANTED, with leave to amend; and

18    3.    Defendant County of Madera's motion to dismiss (ECF No. 42) be GRANTED,

19          with leave to amend.

20    These findings and recommendations are submitted to the district judge assigned to this

21    action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen**

22    **(14) days** of service of this recommendation, any party may file written objections to these

23    findings and recommendations with the Court and serve a copy on all parties.  Such a document

24    should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

25    district judge will review the magistrate judge's findings and recommendations pursuant to 28

26    U.S.C. § 636(b)(1)(C).

27    ///

28    ///

57

1    The parties are advised that failure to file objections within the specified time may result

2    in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014)

3    (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

4

5    IT IS SO ORDERED.

6    Dated:   **June 14, 2023**                    _____
                                                UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28